## Case No. 6,015.

HAND et al. v. The ELVIRA.

[Gilp. 60.] [1]

District Court, E. D. Pennsylvania. April 14, 1829.

SALVAGE—CLAIM OF PILOT—CONTESTING SALVORS.

1. What a pilot does beyond the limits of his duty as such may be the foundation of a claim for salvage, but not such acts as are within them.

[Cited in Lea v. The Alexander, Case No. 8,-153; The Wave, Id. 17,297.]

2. If property abandoned by the master and crew, be taken possession of by a set of salvors: a second set have no right to interfere with them and become participators in the salvage, unless it appears that the first would not have been able to effect the purpose without the aid of the others.

3. The amount of salvage to be allowed must be estimated by the compound consideration of the danger and importance of the service; the value of the property saved is an essential circumstance in estimating the latter.

[Cited in The Wave, Case No. 17,297. Applied in The Charles, Id. 4,556. Cited in The Choteau, 9 Fed. 212; The Sandringham, 10 Fed. 571.]

4. A previous and contradictory statement of a witness may be given in evidence to impeach his credit, but not as proof of the facts formerly stated.

[Cited in Merriman v. The May Queen, Case No. 9,481.]

[This was a libel in admiralty by Recompense Hand, Daniel Hildreth, Enoch El-

dridge, John Reeve, Isaac Smith, William Curgie, Francis Elbertson, Humphrey Hughes, assignee of Simeon Palmer, Jeremiah Bennett, Aaron Bennett, Albert Hughes, and Enoch Willis against the schooner Elvira and her cargo.]

P. A. Browne, for libellants.
Mr. Chauncey, for owner and claimant.

HOPKINSON, District Judge. This is a claim of salvage by the owners and crew of the pilot boat Leo, for services rendered to the schooner Elvira, by which it is alleged she was relieved from great danger and distress, and brought safely into the port of Philadelphia. A correct and careful understanding of the facts of the case is peculiarly indispensable to a just decision of it, for every claim of this description turns on its own circumstances. The argument of the counsel for the libellants has been mainly raised on the statement published in a paper of this city, and furnished by John Seabury, the second mate of the Elvira, which narrates the occurrences of the voyage in the usual animated and exaggerated style of such communications made for the public, and not for the more accurate purposes of a judicial inquiry. I cannot receive this publication as any evidence of the facts stated in it. John Seabury was examined as a witness on behalf of the respondent; what, therefore, he had said or published at another time, was properly admitted to impeach or test his credibility; and so far but no farther was it legal evidence. If a witness at another time has given an account of a transaction different from that given at the trial, he may be impeached by proving what he has said at another time, on the question of his credit; but you cannot substitute the other account in the place of that which you have discredited, making it thus the evidence of the cause. In this case, the difference is rather in the force of the expressions used, in the colouring of the description, in swelling exaggerations, than in matters of fact and essential importance. In a seaman's protest and reports the waves are always mountain high, the winds never less than a hurricane, and the peril of life generally impending. There may be some pride of authorship in these compositions, and the writer may aim to exhibit his power and skill in describing dangers.

I will take the facts as they have been given by the witnesses examined here; and there is no material variance between those on the one side and on the other, where they speak of the same transactions. The Elvira sailed from St. Augustine, in Florida, on the 8th day of February last, loaded with live oak for the navy yard, at Norfolk, and bound for that port. She had on board the captain, the first mate, the second mate, two hands before the mast, two cabin passengers and seven steerage passengers who had been em-

ployed in cutting the live oak. From the 8th to the 21st February nothing occurred that was remarkable; but on the 21st the schooner was knocked down on her beam ends; about 8 o'clock in the morning they cut away the mainmast; the schooner righted and fell off before .the wind. On the 22d they cut away the stauncheons and hove the deck load overboard, part of which had been previously washed off. On the morning of the 23d, the foremast was carried away. They then rigged two jury masts and determined to put into the first port in the United States. They could manage the schooner with the jury masts pretty well; so that they could steer an eight point course. From the 23d of February to the 13th of March, we have no regular or continued accounts 'of the occurrences that happened. It seems that the schooner had been blown off, and had been navigated as above stated. It is important to be here noticed, that the effect of the gale was confined to the destruction of her masts and rigging; her hull does not appear to have received any injury. When she was knocked down on the 21st she took in about three feet of water; but after she righted and was got before the wind, she was cleared of this water by the pumps and leaked very little; about fifteen strokes in two hours, and this came through the deck. From the 21st of February to the 6th of March, the first mate says they were much fatigued, but after that they were better and thought themselves safe. On the 6th of March a man was washed overboard, by their shipping a heavy sea, which did not hurt the vessel. On the 13th of March, they fell in with the schooner Milo, bound from Carolina to New York, and put on board of her the two cabin passengers and two of the steerage passengers, who, I think, it was said, wanted to go there. From the Milo they received some bread and beef, being all the assistance they thought they wanted at that time. On the 14th of March they spoke a ship from round Cape Horn, belonging to Nantucket, but required nothing from her. The mate says that between the 23d of February and 13th of March, they saw several vessels, but did not speak them. During the period mentioned, it was blowing a considerable part of the time, and as an excuse for neglecting his log book, the mate says they had enough to do to keep the ship from going to the bottom. This was between the 23d of February and the 6th of March, after which, he says, they thought themselves safe. On the 17th of March at night, they made the lights on the Highlands, and, but for an unfortunate change of the wind, a few hours would have brought them to New York. But the wind came around to the westward; and the Elvira, unable to get to New York, bore away for Cape Henry, her original destination. On the morning of the 19th they saw a schooner to the west of them, about six miles. At 11 o'clock the wind died away calm. In the afternoon

about 2 o'clock, or, as Palmer the pilot says, about 4 o'clock, they saw a small schooner, in the westward, which they took to be a pilot boat. and proved to be the Leo. She was steering on the wind S. S. E., and the Elvira W. S. W. The pilot boat made one tack and fetched them, ran across her bow, launched a boat and came on board. There is no material difference, I may say, none of any kind, between the narrative of the mate and that of Palmer one of the pilots. Palmer says the weather was suspicious, that the sun was about crossing the line, and they generally look for a breeze. But the fact was that the weather was good, and so continued throughout their service. The situation of the Elvira at the time she fell in with the Leo was, that her masts and rigging were gone, but they had replaced them by jury masts and sails, under which she had navigated the ocean for three weeks; had been blown off the coast and returned to it; by the aid of which she would have safely entered the port of New York, but for a critical change of the wind; and with which she was at that moment making her way under a free sail to Cape Henry, her place of destination. Whether she would have reached there we cannot positively say; but we have had no account of the wind or the weather to render it improbable. I confess that I am not without some doubt, whether, in such circumstances, the captain of the Elvira was justified in coming to Philadelphia at all, and whether it was not his duty to pursue his course to Norfolk. He thought otherwise and may have been right; at any rate he asked and accepted the service of the libellants to bring him to Philadelphia; and he is bound to pay for it.

What was that service in relation to those who offered it, and whose claim to be remunerated for it, is now to be decided? When the Leo saw the Elvira, the former was running with a free wind to her harbour, within the Capes of Delaware for the night. Jeremiah Bennett first discovered the schooner from the mast head. The Leo of her own accord. uncalled by any signal from the Elvira. not knowing of her distress, and perhaps supposing she wanted a pilot (for the Leo was a pilot boat, then actually cruising in her vocation) immediately brought towards the Elvira, making signals for her. These signals were answered by the Elvira, who was then between thirty and forty miles outside of the capes. When the Leo came up with the Elvira, she was under low sail: the longest mast was not above twenty feet long, and she had two masts with temporary sails. When the pilots got on board, the inquiry was not about any danger or distress on board the Elvira. but the usual salutation where are you from. and where bound? The answer was, from St. Augustine, East Florida, and bound to Norfolk. The pilot asked the master of the Elvira, if he did not want to go into the Capes of Delaware. The

second mate, Seabury, says the pilots asked if they wanted the assistance of their boat. Palmer did not go on board the Elvira, and testifies nothing of this part of the transaction. A negotiation commenced for taking the Elvira into the Delaware, the pilots having declined to take her to New York, or Cape Henry, as the captain desired; and a line is given from the Elvira to the Leo, and both vessels proceeded to the Capes of Delaware, the Leo towing the Elvira, but assisted by her sails. The witnesses differ a few hours about the time they came to anchor, within the capes; but there is no dispute that the weather was good, the night light, and no difficulty, danger or fatigue in the navigation; Palmer says, "we towed the schooner along very easily." During the day of the 20th, the wind being unfavourable, they remained at their anchorage within the capes. They left there on the 21st, in the morning, and anchored about three miles below Reedy island. They got under way next morning about eight o'clock; and about two or three o'clock, of the same day, came to, a little below the Point House, that is, about three miles from this city, and were at the wharf in the evening. Both of the mates assert that the Elvira had on board, when the Leo came to her, fifteen days of provision of beef, bread, and water, although their allowance had been reduced. Such are the leading facts of this case; and it is by them, that the claim of the libellants must be decided.

The first question is, whether the official character of the libellants, they being pilots of the Bay and River Delaware, made it their duty to do all they have done for the relief of the Elvira; and whether under these circumstances they can present themselves before the court as salvors. I have no difficulty on this point; nor has it been insisted upon by the counsel of the respondent, although very fully argued for the libellants. The law makes the true discrimination. That which a pilot does in the ordinary course of his duty, can never be made the foundation of a claim for salvage; and the difficulty and exertion being more or less in such a case, can make no difference. He takes his chance for such hazards; he knows he must be exposed to them; and it must be presumed that his official compensation is calculated on the probability of such exposures. He cannot be at the same time, and in the same act, a pilot and a salvor. But he may become the latter, for services beyond the limits of the duty of the former. If when a pilot is put on board a vessel to bring her into port, a violent wind arises, and she is threatened with a casting upon the shore, assuredly it is the duty of the pilot to exert his utmost labour and skill to preserve her: and for so doing he could not set up a claim for compensation as a salvor. On the other hand, cases have occurred, and many may be imagined, in which the assistance rendered by a pilot

is clearly, beyond what could have been required of him by his official duty; and which, as Sir William Scott says, "may exalt a pilotage service into something of a salvage service." I consider this case to be one of that description; and that the libellants are entitled to compensation for the assistance given to the Elvira, according to the circumstances of the case, and the principles of law applicable to it. Whether a seaman can, in any case, become a salvor for services rendered to his ship, in any extremity of danger or distress, is another question, upon which I do not now give any opinion. Great judges have differed about it, but it is clear that a seaman is much more closely bound to a ship than a pilot, and his duties to her are far more extensive, permanent and severe.

In deciding a case of this sort, where every thing is left to the discretion of the judge, I would not exercise that discretion arbitrarily, but hold it under the control of judicial principles and precedents. It is true it is difficult to find or force a rule, by which to measure the quantum of salvage. Circumstances vary so infinitely in the degree of danger; in the extent and risk of the service; in the value of the property; in the conduct and merit of the salvors, that a standard cannot be established to govern every case that occurs; nor even for classes of cases. There are nevertheless some general principles and precedents which have grown out of the experience of the courts, and afford strong lights to guide us in every new case. I will as briefly as it may be done, take a review of the English and American adjudications upon this subject. This review will be somewhat tedious; but as many decisions of high authority have been given, since the subject has been agitated in this court, it may save us trouble in future, to look to them now.

The definition of salvage given by Abbott is clear, comprehensive and accurate. It is "the compensation that is to be made to persons, other than those connected with the ship, by whose assistance a ship or its loading may be saved from impending peril, or recovered from actual loss." A difficulty has seldom occurred in deciding whether any given case was or was not a case of salvage. The question has generally arisen upon the quantum to be allowed. Now whether it be a case of impending danger, or of actual loss, it seems to be required that the property must be saved or recovered by the assistance for which this compensation is claimed. We may not perhaps be so rigorous as to say, that it must be absolutely certain, that the property was saved by the assistance of the salvors, but it should be reasonably probable, that this was the case; and that the ship or cargo was preserved from loss or damage by their labour, skill and exertions. If goods are abandoned by those whose duty it was to take care of them; or if those persons are unable to preserve and protect them, it may be correctly said they owed their preservation to

those who came to their aid; but. it is difficult to maintain this proposition, when the proper guardians of the property remain with it; and have both the ability and inclination to protect it from loss or damage. Therefore, if property abandoned by the master and crew be taken possession of by a set of salvors, a second set have no right to interfere with them and become participators of the salvage, unless it appears that the first would not have been able to effect their purpose without the aid of the others. The same principle must apply to a case, when the master and crew of the vessel are able to effect the purpose of preserving and bringing her safely in, without the aid of others. My main doubt throughout this case has been upon this point. I have not clearly seen the necessity of any interference on the part of these salvors. I have not been satisfied that the Elvira could not have made her proper port, or some other, in safety; that she might not have come into the Delaware without the assistance of the pilot boat; that she was "saved from an impending peril." A service may be convenient, beneficial, meritorious, and not necessarily, a salvage service. I will not, however, urge this objection upon the libellants. The master of the Elvira thought proper to accept the assistance offered to him; and the owner now is willing to pay what may be considered a just and reasonable compensation for it. No exception has been taken to it, on this account. The respondent has met the claim on liberal grounds. It may be that the master of the Elvira acted with a proper precaution, and attention to the interests of her owner, in coming here to refit. A change of weather might have been apprehended at that season, which would have been dangerous to him; but in the actual state of things, when he put himself under the protection of the Leo, his danger was not pressing or apparent. The "impending peril" was not immediate, or perceptible. This schooner had previously met with several vessels; had asked no assistance from any of them, further than some small articles of provision and water; her master and crew had never intimated any apprehension of personal danger, nor any intention of seeking safety by leaving her. She was sound and tight in her hull, and with masts and sails, with which she could be pretty well managed. She had encountered and conquered much greater hardships and dangers than any that lay between her and her port; and the fair presumption is that she would have reached it.

We must inquire into the quantum of salvage that should be allowed in such a case, according to the principles and practice of admiralty courts in other cases.

The compensation, which may be justly allowed for this service, should be governed by a compound consideration of the importance of the service rendered, and the danger and labour to which the salvors were exposed in rendering it; and the importance of the service depends upon the value of the property saved, and the extent of the danger, which threatened it. With a view to public policy this allowance should be weighed in a liberal scale; but with a primary regard for the unfortunate sufferer, whose protection, relief, and interests are the true objects of policy. It has frequently fallen to the lot of Sir William Scott, a most liberal admiralty judge, to estimate the value of salvage services, and we shall see the measure he has adopted in the case of The Aquila, 1 C. Rob. Adm. 37. In that case the ship and cargo were found at sea, absolutely deserted by those, whose duty it was to protect them, and a total loss was certain unless prevented by strangers. The finders contended for a property in the goods as their own; and not merely for a reward as salvors. This, and several other interesting questions, were discussed in the case, which are not to our present purpose. The rate of salvage is our inquiry, and in this most desperate case, in which the owners owed every dollar that was restored to them to the services of the salvors, Sir William Scott gave them but two-fifths; or less than one-half. In the same volume, page 306, the case of The Joseph Harvey is reported. This was the petition of a pilot for salvage, in which it was decided that a pilot may render a service to a ship in distress, which will entitle him to be considered something of a salvor. The petitioner espied the Joseph Harvey under a signal of distress; the wind blowing hard; the waves running high. He went to her and got on board with great difficulty; this the judge thought gave no claim to any thing more than common pilotage. It is not, says he, for such reasons that pilots can be entitled as salvors; their occupation is hazardous from its nature. In the case of The William Beckford, 3 C. Rob. Adm. 355, Sir William Scott, says: "The principles, on which the court of admiralty proceeds, lead to a liberal remuneration in salvage cases; for they look not merely to the exact quantum of service performed in the case itself, but to the general interests of the navigation and commerce of the country, which are greatly protected by exertions of this nature. The fatigue, the anxiety, the determination to encounter danger, when necessary, the spirit of adventure, the skill and dexterity which are acquired by the exercise of that spirit, all require to be taken into consideration. What enhances the pretensions of the salvors most, is the actual danger which they have incurred." I cannot forbear to observe, that not one of these elements of salvage, so eloquently described, is found in the case before us. Neither fatigue; nor anxiety; nor courage; nor spirit of adventure: nor skill and dexterity; nor the least actual danger. In the case of The William Beckford, the judge thought there was no peril of life, in the degree contended for

by the salvor's counsel; from which expression we must presume it did exist in some degree; but there was great alarm about the possibility of saving the ship after she got upon the sand. It was proposed to the master to throw the cargo overboard, and he acquiesced in it, and it was resisted by the salvors, who used their efforts and employed their skill, and the ship and cargo were finally saved. These exertions were continued through the third day. and the salvors were numerous. A circumstance always, and properly considered. The judge acting in so strong a case of labour, skill and service, and applying to it the liberal principles with which he prefaces his decree, gave to the salvors, less than one-fourteenth part of the value of the property saved; that is something more than one thousand two hundred pounds, on seventeen thousand six hundred and four pounds.

In the case of The Trelawney, 4 C. Rob. Adm. 223, the Lord Nelson a slave ship had recovered the Trelawney, another slave ship, on the coast of Africa from some insurgent slaves, who had dispossessed the master and crew and set them on shore. This was done after a severe conflict. with very desperate persons, in which some of the crew of the Lord Nelson were wounded. Without this adventurous effort. the Trelawney and her cargo would have been inevitably lost. The judge in deciding the case says, he will consider the value of the property and the service performed, which, he adds, "is to be considered as a rescue effected from pirates. and, to say the least of it, full as meritorious as recovering property out of the hands of a public enemy." On this view he would have given salvage in as high a proportion as directed by the prize act, for cases of recapture of war. But he remembers the nature of the trade, in which the two ships were employed; their common danger, and the policy and duty of rendering mutual assistance, and not as ships accidentally rendering such assistance—considerations having some bearing on the case before us. Under these circumstances the court allowed one-tenth of the ship and cargo. both confessedly saved from total and inevitable loss. In the case of The Blenden Hall, 1 Dod. 414, the vessel, loaded with naval stores, was separated from her convoy by tempestuous weather, by which she was greatly damaged in her hull and rigging; she was taken by a French frigate, her master and crew taken out, and the ship scuttled. She was found in this situation, by the packet Eliza, who put a number of her crew on board of her. Afterwards, being in great peril from stormy weather, and in great distress, she was relieved by the Challenge who put men on board of her, and she was brought to Plymouth. Sir William Scott gave one-tenth of the value of the property saved to the salvors. The case of The Raikes, 1 Hagg. Adm. 246, was the first case of salvage service by a

steamboat. Lord Stowell declares his inclination to encourage, as much as possible, similar exertions, on account of the great skill and power of vessels of this description. The ship saved was delivered from a perilous situation; there was great alacrity in rendering the assistance; the steamboat went out from Dover, being sent for on purpose to relieve the Raikes; she lay by her all night in the month of December, watching and attending her, and finally brought her safe in. The vessel and cargo were estimated at the value of twelve thousand five hundred pounds, and the judge meaning, for the reasons stated, to be exceedingly liberal, allowed the salvors two hundred pounds. The commissioners, from whose award this was an appeal, had given but one hundred and fifty pounds.

These are the leading English cases, and fix a principle of liberality tempered by moderation, and a just regard to the rights of the owners of property exposed to marine hazards, that may be safely followed. The American decisions, on this subject, do not differ in their principles from those cited from abroad, although the allowances appear to be rather more liberal.

I shall refer to some of the best authority. An early and leading case in this district, is that of Warder v. La Belle Creole [Case No. 17,165]. Judge Peters, who examined the question very carefully, says that the compensation is not to be a mere quantum meruerunt, but an exemplary reward; comprehending a reward for the risk of life and property by the salvors; labour and danger; and even as a premium for similar exertions. He quotes the principle that "he, who has recovered the property of another from imminent danger, by great labour, or perhaps, at the hazard of his life, should be rewarded by him. who has been so materially benefited by that labour." Thus an imminent danger, great labour, hazard of life, and material benefit, are the ingredients of a meritorious salvage. The judge says, "that the maritime law has varied from twentieth to one half, according to the description and value of the article saved, and the risk, labour and expense of salvage." In this case of The Belle Creole. the court allowed a salvage of one-third. The circumstances were these. The libel stated that when the saving ship fell in with the Belle Creole, she was declared to be sinking; her master desired the salvors to remain by him; the weather was tempestuous; and the captain and crew. at their repeated solicitations, were taken on board of the Amiable. A proposition was made to burn the Creole. Her captain and crew declared when they left her, that they relinquished and abandoned her, and every thing on board of her; she was left without a living person on board; the next day the master and crew of the Amiable took from her a quantity of merchandise. and she was set on fire at the request of her master. The

answer admitted, that she was in great distress, and in danger of perishing; and the leading facts stated in the libel, were established by the evidence. She had eleven feet of water in the hold, when the articles were taken out of her; and one half of her cargo had been thrown overboard, before she fell in with the Amiable. The judge speaks of her situation as distressed and hopeless. In the case of The Cato [Taylor v. The Cato, Id. 13,786], she was found by the Alexander "in great distress, and on the point of perishing." Her master, crew, and part of her cargo were taken out of her, and she was abandoned. A gross sum of one thousand five hundred dollars, was allowed to the salvors, being about two fifths of the property saved. The schooner Polly [Tyson v. Prior, Id. 14,319], with a cargo of flour, was dismasted at sea; continued nine days under jury masts, and was in a very distressed situation. She fell in with the Triton, on board of which her whole crew went; and which remained by her that day and the following night. Then another ship, the Reserve, came up, and the Triton being heavily laden, the captain and crew of the Polly went on board of the Reserve. The Triton left them; the Reserve took the Polly in tow for five or six days; and during that time took out the articles libelled, having been detained by this service a week on her voyage. Judge Story, affirming the decree of the district court, allowed a salvage of one-third. Observing that "by the stoppage, it seems to have been generally considered, that a deviation resulted, and of course that the ship was put at the hazard of the owner." In the case of The Blaireau, 2 Cranch [6 U. S.] 240, two fifths were allowed by the supreme court of the United States, in a very hopeless case, recovered altogether by the salvors. The case of The Cora [Bond v. The Cora, Case No. 1,621] was a deplorable case of distress. She was deserted by her crew, with five feet of water in her hold; and brought into port by part of the crew of the Ceres with great difficulty; exposing the Ceres to great danger from the absence of so many of her hands. The men put on board the Cora were also exposed to much danger, during a storm. In such a case, one third of the gross amount of sales, was given to the salvors, by the district court, and affirmed on appeal, by the circuit court. The Maria [Jurgenson v. The Catharina Maria, Id. 7,587] suffered in a storm "so long and so much, that she became a mere wreck, and no hope of safety was left." One third of the articles saved from her was allowed to the salvors. The Maria sunk and was lost.

With these precedents in our view, I will recur to the case of these libellants. I have already shown, that the "impending peril," if any existed, was inconsiderable, uncertain, and distant; resting rather in apprehension than reality. The danger of the original disaster had gone by; "we thought ourselves safe," says the mate, and the conduct of all on board shows that they really did think so. Such being the condition of those to whom the assistance of the libellants was tendered and given; what is the amount of the merit of this assistance, in reference to the labour, skill, risk, and expense with which it was attended? When the libellants descried the Elvira, they were cruising in their ordinary vocation, looking out for employment; they were, it is true, without the prescribed limits of their pilotage ground, but they had gone there for their own pleasure or profit, and not in the service of the Elvira; at the moment they were steering for their harbour, within the capes, for the night. They return six or eight miles to the Elvira; and this was all the distance they went out of their way. They made fast a tow line; resumed their course to their harbour, and came to it, in fine weather, and with a favouring wind, a few hours later than they would have done, had they left the Elvira to her fate. So far they had endured neither labour, risk nor expense in this service. On account of a head wind they remain snug and safe in this harbour during the next day, which was the 20th of March; in the morning of the 21st, they make sail and proceed up the bay; and in the evening come to anchor about three miles below Reedy island. The next morning, at about eight o'clock, they are under way again; and come to, above the Point House, that is, about three miles below the city, at between two and three o'clock, in the same afternoon; in a short time they are at the wharf in this city. All this was done without one moment of anxiety or danger; one effort of labour; and a very small expense. The sails of the Leo and the Elvira, acted upon by a favouring breeze, performed the whole duty, and for aught we know, the crews of both vessels reposed in total inactivity, during the whole passage. In coming within the capes, on the night of the 19th, the libellants only did what they would have done for their own purpose and accommodation: and all they added to their labour in the service of the Elvira, was the passage from thence to Philadelphia, and the towing of her into the capes. The Elvira appears to me to have been so entirely able to get up to the city of herself, that I am inclined to believe, the Leo accompanied her, not because her aid was necessary, but to look after her reward. When we consider the rate, at which these vessels came up the bay and river, sailing from their anchorage, a few miles below Reedy island, to Gloucester Point, a distance of fifty-five miles, in about seven hours, it is clear the Elvira did not hang very heavily on her conductor, but must have been greatly aided by her own sails in her progress. I must repeat, that it can hardly be doubted, that she could have come up of herself; that after she got within the capes, she was no longer in any danger: and that the necessary, indeed the useful service, she received from the Leo, ended on their anchor-

ing in their harbour, on the first night. It will be recollected, that she there got a new anchor from the shore, and her danger at least was at an end.

In assessing the compensation, which should be paid to these libellants, we must not overlook the great loss irretrievably sustained by the owner of the Elvira and her cargo, by this disaster. Her masts, sails, and rigging entirely demolished; her anchor and chain cable lost; her load thrown or swept overboard; and a voyage protracted for six weeks, that might have been performed in as many days. It is perhaps not too much to say, that half of his property has been sunk in this misfortune. It would be cruel and unjust to aggravate so much suffering, by an extravagant charge for such inconsiderable services. We must not teach a salvor, that he may stand ready to devour what the ocean may spare; he must not be permitted to believe, that he brings in a prize of war, and not a friend in distress. If he has afforded his assistance to the distressed in a proper spirit, he will be satisfied with a just and fair remuneration for the labour, hazard, and expense he has encountered in the service; and it is only a proper spirit that we should seek or desire to satisfy. To this measure of compensation the judge, governed by a liberal policy, will add a reasonable encouragement, which the generous and humane will hardly need, to prompt men to exertions to relieve their fellow men in danger and distress. But we must remember that the policy of the law is not to provoke or satisfy the appetite of avarice; but to hold an inducement to such as require it, to make extraordinary efforts to save those, who may be encompassed with perils beyond their own strength to subdue. In the present case we can hardly say, that any extraordinary effort was made; to take a tow line for a disabled vessel, is one of the most ordinary acts of courtesy among seafaring men. I know of no probable or plausible calculation, on which I can suppose that this pilot boat, and those on board of her, could have earned half the amount tendered by the respondent, while engaged with the Elvira, and certainly they could not have earned it, with less labour, risk and expense. I decree that the sum of three hundred dollars, which is above one ninth of the value of the property saved, be paid, clear of costs to the libellants for their services rendered to the schooner Elvira, and her cargo. If in fixing this amount of salvage, I have been influenced by the sum offered by the respondent, I can assure the libellants that that influence has been altogether favourable to them. I make no order of distribution among the salvors, as their counsel has informed the court, they have arranged, or will arrange, this matter among themselves.