[See Case No. 6,750.]

---

## Case No. 6,752.

### The HOWARD.

[Cited in Baker v. Cargo and Materials of The Slobodna, 35 Fed. 543. Nowhere reported; opinion not now accessible.]

---

## Case No. 6,752a.

### The HOWARD.

[2 Adm. Rec. 148.]

Superior Court, S. D. Florida. April 7, 1838.

SALVAGE COMPENSATION — ILLIBERAL CONDUCT OF SALVORS — PROFESSIONAL WRECKERS.

[1. Salvors who adopt a liberal course of conduct towards a vessel in distress, tendering their services promptly and without stipulations or conditions, and acting gallantly and with alacrity, are entitled to a more liberal reward than those who either wait to be called upon for assistance, or refuse to render it unless the vessel is placed in their charge as security for compensation. The latter attitude is especially worthy of condemnation, and the master who would yield to such a demand, under any circumstances short of total loss, would prove unworthy of his trust.]

[Cited in The Angeline, Case No. 385.]

[2. A wrecking master and his crew boarded a vessel aground on the Florida Reef, and offered to assist in unloading her. The master answered that he did not want his vessel unloaded, as he thought he could get her off without it. He asked, however, that the wrecking crew might "lend a hand" in getting out an anchor. The wrecking master replied that he had no control over his men, and they might assist if they wished to, and his crew then refused to help unless the stranded vessel were given up to them. Held, that the wrecking master's conduct was aggravated by his statement that he had no control over his men, for such control is the only security which the owner has for valuable property necessarily coming into the hands of wreckers in the course of their business.]

[3. Twenty-five per cent., upon a valuation of $35,391, allowed to several wrecking vessels, and their officers and crews, for rescuing, in partially damaged condition, a vessel and cargo stranded upon Florida Reef.]

In admiralty.

Wm. Marvin, for libellants.

C. Walker, for respondent.

WEBB, Judge. In this case James Curry and others have libelled in admiralty, and caused to be attached by the process of this court, the British bark Howard and her cargo of sugars, upon a claim for salvage services alleged to have been rendered in relieving them from great and imminent perils to which they were exposed on the Florida Reef; and, under the same attachment, petitions are presented by Asa F. Tift and George P. Young, also asking compensation in the way of salvage for services rendered by themselves and their respective crews in assisting to save the same property. From the history of this case, as it is disclosed in the pleadings, and by the testimony, it appears that on Saturday night, the third instant (March), the bark Howard, while prosecuting a voyage from Havana, in the island of Cuba, to St. Petersburgh, in Russia, ran ashore on the Florida Reef. That shortly afterwards she was boarded by the petitioner Tift, and six men under his command, who immediately commenced laboring with the crew of the bark for the purpose of relieving her. That they continued to labor all night, and until 11 o'clock a. m. of the next day, before they succeeded in hauling her off the rocks. That about 8 o'clock on Sunday morning, while the bark was still on shore, she was boarded by Captain Tresca, of the sloop Globe, one of the libellants, who tendered the services of himself, his vessel, and crew to unload the bark, which services the respondent did not choose to accept, stating that he did not want his vessel unloaded, as he believed he could get his ship off without taking out any part of her cargo, but, as he was then engaged in getting out another anchor, he would like to have some assistance from Tresca's men (his boat's crew) then on board the bark to aid his own crew in getting it out, to which Tresca replied that his men might assist if they thought proper, but he had no control over them. That the

men, on being asked to assist about the anchor, answered that they would do so if the bark was given up to them; but the respondent declined securing their services upon those terms, and proceeded with the force he already possessed, including Tift and his men, and in three hours succeeded in hauling off into deep water. That, shortly after the conversation between the respondent and Tresca and his men, the masters of the schooners Hester Ann, Citizen, and Susan Hooper, boarded the bark, she being still on the rocks; but between them and the respondent nothing was said respecting their assistance. They tendered none. none was requested of them, and none was rendered by them. That after the bark was hauled off, owing to the peculiar position of the reefs, near which she lay, and the wind being ahead, it was found impossible to proceed to sea, and she was permitted to remain, swinging to the single anchor by which she had been hauled off, under the impression, no doubt, that it was amply sufficient to hold her securely, as she was then comparatively but little exposed; but, in consequence of the wind blowing during the succeeding night with much greater violence than it had previously done, she was again drawn upon the rocks, and, beginning to leak very shortly afterwards (which she had not previously done), a signal was hoisted for assistance; and the libellants, who were lying with their vessels in a harbor about a mile off, immediately proceeded to her, and, after taking out part of her loading, succeeded in relieving her and bringing her to this port.

The dangers to which the bark and cargo were exposed, when the services of the libellants were accepted, the extent of their services, and the difficulties and perils which they encountered in their performance, together with the losses which the cargo had sustained in consequence of the injuries received by the ship, are all set forth in the pleadings, and it is unnecessary to repeat them here, particularly as there is but little discrepancy between the parties in their representations of this part of the transaction. But the respondent, while admitting the performance of the services, nearly in the terms charged by the libellants, denies that they are entitled to any reward or compensation for those services, because he says the proper assistance was not afforded him at a time when it would have prevented all the injuries which subsequently occurred. He contends that had the men of Tresca assisted him, in taking out his anchor, at the time they were requested to do so, it would have prevented his vessel from going on the rocks the second time, as that anchor, in addition to the one by which she was hauled off, would have been sufficient to have held her, notwithstanding the severity of the subsequent blow, and that all the injuries which the ship and her cargo afterwards received are owing to their improper conduct in refusing their assistance in carrying out the anchor, or imposing such terms for their services as he could not accept. That the other libellants have also forfeited all claim to compensation or reward for their services, because they did not voluntarily tender their assistance when they boarded the bark, to take out the anchor especially as they discovered that his own crew and Tift's men were laboriously employed in trying to get it out.

On the part of the libellants it is denied that they refused to render their assistance at any time, and it is averred that when Tresca boarded the bark, he tendered the assistance of himself, men, and vessel, which was unconditionally refused by the respondent, who only expressed a desire that his (Tresca's) men should lend him a hand to get his anchor out, and that his men did not refuse to afford that assistance, and only meant by saying, "If the vessel now given up to them," that they should be considered as having a lien upon her which would secure to them a compensation for the services they might render in getting her off the rocks. That the respondent did not want their assistance when they first boarded the bark, as he believed he could get her off without, and therefore was not disposed to pay for assistance which was not essentially necessary to the preservation of his ship or cargo. That, as regards the other libellants, there was not even a desire expressed that their aid should be afforded in any way; and that as soon as their services were needed in the estimation of the respondent, and required by him, they were promptly rendered and efficaciously bestowed, without any condition whatever on their part.

From the testimony, I am fully satisfied that the respondent did not believe, when Tresca boarded his vessel, that he absolutely required any additional aid to secure the preservation of his ship and cargo from injury. She was then staunch and tight, had leaked none, and, as he himself says in his answer, she thumped but lightly, and the wind was moderate. It is also in proof that all on board believed she could be gotten off without further assistance; but as the crew of the bark and Tift's men were much fatigued by their labors during the preceding night, it would have been convenient and acceptable to them had Tresca's boat crew who were fresh, "lent them a hand" in getting out their anchor. Whether the respondent intended to pay them for lending a hand or not does not appear; but I think it is altogether apparent that he did not intend to regard them in the light and character of salvors for any service they might perform in getting out the anchor.

There is, however, another feature connected with this part of the transaction which, if susceptible of explanation at all, shows that the services of the libellants in carrying out the anchor could not have been so important as the respondent has since

chosen to estimate them. He alleges that the injuries which resulted to the vessel and cargo are attributable to the improper conduct of the salvors. in not affording their assistance in getting the anchor out before she was hauled off the first time, as that anchor, had it been taken out in proper time and placed in a proper position, would have prevented her going ashore the second time. This may be true, but the conclusion is by no means apparent to the mind of the court, when judging from the facts disclosed by the pleadings and the testimony. It seems that the anchor, about the taking out of which there is now so much controversy, was carried out by the crew of the bark and Tift's men, but was rendered wholly useless in consequence of the chafing and parting of the cable. How the parting of the cable would have been prevented by the employment of Tresca's men, or the other salvors, in getting it out, is not shown, and there is no pretense that it was designed to substitute a chain cable in place of the hempen one that was used, had they received the additional aid; nor does it appear that they ever had another chain cable on board which could have been so substituted. It is said, however, that the stream anchor, when carried out, could not be placed in the proper position for the want of sufficient force, and that the chafing of the cable, which destroyed its use before it could be serviceably employed in hauling the vessel off, was owing to the length of time which it required the bark's crew and Tift's men to get it out. This statement does not, to my mind, sufficiently establish the fact that the subsequent injuries received by the bark are attributable to the misconduct of the libellants in not rendering their services in getting the anchor out, and placing it in the proper position: First. Because it is not perceived why the force of the bark, crew, and Tift's men was not sufficient to take out, in daylight, a stream anchor with a hempen cable, and place it in position which they wished,—especially when the wind was moderate, as is alleged in the answer,—when the same force had previously taken out in the night the bower anchor with a chain cable, and placed it in such a position as enabled them to haul off the ship by it. Second. Because the stream anchor was not essentially necessary in hauling off the bark, as is proved by the fact that she was afterwards hauled off by the bower anchor alone. Third. If the hempen cable attached to the stream anchor was rendered useless by chafing during the comparatively short time employed in getting out the anchor, it is not presumable that it would have lasted through the following night, and aided the bower anchor in keeping the ship off, especially as the wind had increased in violence, and consequently the strain on the anchors and chafing of the cables must from that cause have been greatly increased. Besides, it is alleged in the petition of Tift, and not in the answer, that the bark was gotten off the first time about 11 o'clock on Sunday morning; and although she had but one anchor out, and as it is now said was not hauled off as far as she ought to have been, yet there was no attempt made during the remainder of the day to get out another or to haul her further from the shoal, notwithstanding the weather was such as would have permitted them to have done either, had either been deemed necessary. This circumstance, however, is not adverted to for the purpose of imputing negligence to the respondent,—for I have no doubt that he (and it is in proof that Mr. Tift, who knew the coast and prevailing winds) believed that the ship, after being hauled off the first time was in perfect safety; but it shows that he did not at that time regard the services of the libellants as of any importance to him, and that he made no effort to obtain their aid, further than simply to request it as a personal favor, that his own men, who were fatigued, might by that means obtain some respite from the severity of their labors.

Viewing the transaction, therefore, in every aspect which is presented to my consideration, I have not been able to arrive at the conclusion that the injuries received by the bark and her cargo, in consequence of her going on shore the second time, are properly attributable to the neglect or misconduct of the salvors in not rendering their aid when they boarded her on Sunday. But while the testimony, in the opinion of the court, exonerates them from being the cause of so much injury, it at the same time places some of them in an attitude which the court sees with regret, and which calls for its animadversion and rebuke. It should be recollected that from the peculiar character of the Florida coasts, and the dangerous shoals, reefs, and currents with which it is environed, and by which the immense commerce that continually floats through the Gulf of Mexico is at all times exposed to ship wreck, the business of wrecking has grown into an established and well-defined profession, distinct from, and unconnected with, all other occupations. Those who are engaged in it have avowedly abandoned all other pursuits, and devoted themselves and their property alone to this. They hold out the idea that they have prepared themselves, at a great expense, to render their services efficiently when required; that they are at all times ready to afford aid and comfort to those who are in distress, and are ever willing to risk their own lives and property to save the lives and property of others. Such a profession on a coast like this, when properly pursued, is not only essentially beneficial to commerce, but is honorable in itself, and affords frequent opportunities of exercising the finest and most generous feelings of the human heart, and such a profes-

sion will always receive that encouragement from every reflecting and liberal tribunal which it so justly merits. But while an enlarged and sound policy dictates that every proper encouragement should be given to those who faithfully perform the duties of such a calling, and the obligations it imposes, the same policy requires that any departure from strict propriety should be visited with its appropriate punishment.

It is not the single act of saving the property of others when exposed to danger, however perilous or laborious the services, that will entitle the salvor to the highest consideration when he presents his claims for compensation. There will always be something in the manner in which the services are performed which will be taken into account, and will have its influence in the decision of such questions. The wrecker who, regardless of personal considerations, gallantly rushes into dangers to preserve the lives and property of others, when exposed to the horrors of ship wreck, or he who promptly goes forward, and contributes his aid when he believes his services will be beneficial in preventing impending loss, without stopping to enquire what amount in dollars and cents his exertions will bring to his own pocket, will always receive that liberal reward for his labors which it is the policy of the law to allow, and which courts feel pleasure in awarding to generous and manly conduct; while he who holds back and quietly looks on at approaching ruin until his own services become indispensable to the preservation of the property he sees exposed, with the expectation that his reward will thereby be increased in proportion to the increased dangers from which the property is ultimately rescued, will find that he is disappointed in the realization of his golden hopes, and that a display of avarice at such a time renders him an object of contumely and reproach.

To the credit, however, of most of those who are engaged in this business on the coast of Florida, few complaints of this kind have been heard. The fearless daring of the Florida wrecker in the hour of peril, and his readiness to afford relief to those who need his assistance, are almost proverbial; and until recently the generosity with which he has warned the stranger of the dangers that surrounded him, and the benevolence with which he has pointed out the way of avoiding those dangers, without the expectation or even hope of reward, have been often urged as arguments before this court in commendation of those who follow that profession. And I have pleasure in saying that such arguments have had their full influence in causing the liberal salvages which have generally been awarded at this place. But in proportion to the disposition which this court has always evinced to award with a liberal hand gallantry and merit in the salvors, so, in the same proportion, has it

always been disposed to take away that reward from him whose conduct is either illiberal or unworthy.

In the case under consideration, I regret that this rule must be enforced to the prejudice of some of those who claim here as salvors, not because I believe the injuries to this ship and cargo have resulted from their improper acts, but because they did not adopt that prompt and liberal course of conduct upon first visiting the bark which they should have done, and which I had believed was characteristic of the Florida wreckers. The course pursued by Capt. Tresca cannot be tolerated; because, if it resulted in no injury in this instance, in another case a similar course might cause the entire loss of the most valuable property. Besides, such conduct is not befitting him who sets out with the avowed and only intention of affording his assistance in the relief of the property of others when exposed to peril, and who is in the daily habit of presenting that object as an evidence of his general merit as a salvor. It is no argument in justification of the apparent unwillingness to work, to say that they had no lien upon the vessel or cargo, for their compensation, unless she were given up to them by the master. The labor which they might have bestowed in relieving her would have constituted their best lien; and those who are employed as wreckers on this coast are too well acquainted with their rights not to have known that such a lien would be recognized in all courts. Besides, the master had no right to give up his ship to them; and a demand to that effect was an insult offered to him in his misfortunes, as it presupposed his inability to command or direct the operations of his crew and others in a case of emergency. In such a case he would no doubt avail himself of the local information possessed by those who were assisting him, respecting the reefs and shoals by which he was surrounded, and would act upon their instructions and advice in avoiding them; but the master of a ship who, under any circumstances less than its total loss, yields his entire command to strangers, of whom he can know nothing, is undeserving the situation he holds, and to require it of him is requiring that which no one who regards his own character will give up.

There is another matter in relation to the conduct of Captain Tresca which places him in a worse position, in the opinion of this court, than that occupied by any of the other salvors. When requested to direct his men to assist in taking out the anchor, he replied, as it is alleged and proved, that he had no control over his men, but they might assist if they chose. It is a well-established rule that masters of all vessels are, to a certain extent, responsible for the conduct of their men while under their command; and, if this be a correct principle in reference to vessels ordinarily employed, how

much more strongly should it apply to the masters of vessels engaged exclusively in the pursuit of wrecking. Property to an immense amount sometimes comes into their hands, in the hurry and confusion incident to ship wreck, without any of the guards which its owners, in the shape of bills of lading and receipts, ordinarily place around it, for its protection from negligence or embezzlement. And if the masters of these vessels have no control over their men, in what consists its security while in their custody? The fidelity of the masters themselves is in some degree secured by the license which they are required to have before they can engage regularly in this business; but the ordinary seamen who are employed on board such vessels, are unknown to the court which grants the license, and, indeed, to the whole world, except the master who employs them. He alone knows them, and introduces them into this business as worthy of confidence, and he is responsible for their conduct; and for him to say that he has no control over them, when required to work in their professed calling, is an aggravation of his own evident unwillingness to perform the duties imposed by his avowed undertaking when he obtained his license. As to the men, though not blameless, I consider them much less culpable than the master. They looked to him as a guide for their own conduct; and, seeing his unwillingness to take hold, it is not surprising that they should have felt the same; especially as they doubtless thought by holding back they might get a more profitable job, should the ship not be gotten off by those employed with the anchor.

The masters of the schooners Hester Ann, Citizen, and Susan Hooper, though less in fault than Captain Tresca of the Globe, are nevertheless not wholly free from censure. They did not pursue that liberal and generous course which is expected from those who are engaged in the profession which they have adopted. When they perform meritorious services, they always look for a high reward for those services; and, in support of their claim to it, they invariably urge, as one among other reasons (and its force is never denied), that they are engaged in no other pursuit from which they could obtain a living, and are at all times at the point of danger, ready to render aid and succor to the distressed. Such an appeal should have its effect, but the right to make it imports something more than barely looking on at the distresses and difficulties of others, and waiting to be asked to render their assistance when no other hope of safety is left. They should voluntarily go forward and tender their services without condition or stipulation, and, if not rejected, should render them with ardor and alacrity, and then expect what they would always receive, an ample reward for their labors.

As regards the other salvors represented by the libellants, although included in the general denunciations of the respondent, there is no just cause of complaint against them. They at no time evinced any indisposition to perform their respective duties, but, on the contrary, the very moment a signal was made on board the bark indicating that their services were needed, they went promptly to her relief, and labored faithfully till it was accomplished.

In respect to the petitioner Tift and his men, there is not a shadow of complaint. Their services are acknowledged to have been of great importance, and to have been rendered with the utmost promptitude and fidelity from the beginning to the end of the whole transaction. They are therefore entitled to the most liberal consideration in estimating their claims to compensation. Nor is there any complaint against the petitioner, Young, and his men. Their services, however, were of a different character. They were not employed until the latter part of the transaction, and had not an opportunity of doing much. But they will nevertheless, in consideration of their good conduct, receive an equal share, in proportion to their numbers, with those salvors who are libellants in this cause. The appraised value of the undamaged part of the cargo saved in this case, exclusive of duties, is $23,504. The sales of the sugars which were damaged by salt water, made under an interlocutory order of court, produced, also, exclusive of duties, $4,387; and the appraised value of the bark in her damaged state is $7,500,—making an aggregate value of $35,391. Twenty-five per centum on that sum, which the court believes to be the proper proportion to be allowed as salvage for the services rendered in rescuing this property from the perils to which it was exposed, had there been no charge of improper conduct against any of the salvors, would produce the sum of $8,847.75, from which sum is to be deducted the salvors' proportion of expenses in landing the cargo at the wharf in this place, and the repacking of the damaged sugars, and the sales of these sugars, say $347.75, leaving a balance of $8,500 to be distributed as follows: To Asa F. Tift and his men, as a reward for their faithful and meritorious conduct, $1,500; to the four vessels employed in saving the cargo and bringing it to this port, $3,500; to the other men employed, exclusive of forfeited shares, $2,880, to be laid out in 49 full shares and 4 half shares, and distributed among them as follows: To those employed on board the schooner Hester Ann, 11 shares,—2 of which to be paid to the mate, 1 to each of the ordinary seamen, and 1 to the master, his other 2 shares being forfeited for neglect of duty; to those employed on board the Citizen, 11 shares,—2 to the mate, 8 to the men, and 1 to the master, his other 2 forfeited; to those employed on board the Susan Hooper, 13 shares,—2 to the mate, 10 to the men,

and 1 to the master, his other 2 forfeited; to those employed on board of the Globe, 9 full shares and 4 half shares,—2 of which to the mate, 7 to the seven men not on board the bark on Sunday, and a half a share each to the four men who were with Captain Tresca on board the bark, the master's shares all forfeited; and to Captain Young and his four men which were employed, 5 shares, to be divided equally; and to the respondent, for and in behalf of all persons interested in said bark and cargo, $620, being the value of 9 full shares and 4 half shares, forfeited by the masters of the schooners Hester Ann, Citizen, and Susan Hooper, and the master of the Globe and his four men.

After the opinion of the court as regards the amount of the salvage to be paid, and the reasons for that opinion, were pronounced in this cause, the respondent requested that the case might still be kept open for two weeks to give him an opportunity of consulting friends in Havana as to the least injurious mode of raising the money for the payment of the salvage and expenses; and this request was most cheerfully granted by the court; and, as that time has now elapsed, it is presumed that he has made his arrangements to settle the business without resorting to a sale of any of the cargo, except such as from its injured condition requires to be sold. A venditioni exponas, however, must be issued unless the amount has already been paid into the registry, but it will be returned satisfied upon the payment to the marshal of the amount of the decree, including the costs.