WILMINGTON TRANSP. Co. *v.* THE OLD KENSINGTON.

*(District Court, S. D. California. July 1, 1889.)*

**1. SALVAGE—COMPENSATION.**

The master of claimant's ship, having discovered that there was fire in the hold, requested libelant's services in towing her ashore and extinguishing the fire. In performing these services libelant employed three tugs, aggregating $40,000 in value, and a number of men. It appeared that, with the exception of a small tug about 10 miles distant, libelant's tugs were the only ones within 100 miles, and that they were maintained at an expense of about $6,000 per month for towage, salvage, etc. The actual value of the services rendered by libelant and the damage to the property employed was $1,510.41. The value of the ship was $48,000, and her cargo $23,790. *Held,* that $4,510.41 salvage would be allowed.

**2. TOWAGE—CONTRACT.**

The master of the ship, desiring to put her aground, agreed to pay libelant $500 to tow her ashore. When the ship in tow reached a suitable place, her port anchor was let go, and the tug ordered to go astern and draw the stern of the ship to the shore, so that she could be secured in that position, while another of libelant's tugs carried out a kedge anchor. *Held,* that the contract of towage did not end when the port anchor was cast, but when the ship was placed in the proper position to be put aground.

In Admiralty. Libel for salvage.

*Milton Andros,* for libelant.

*Page & Eells,* for claimant.

Ross, J. This is a cause of salvage. That salvage services were rendered by libelant is not denied, but the parties are not agreed as to when such services were commenced, nor as to the amount the libelant should be awarded. It appears from the evidence that the ship Old Kensington was, on Sunday, April 7th, lying in the bay of San Pedro with a cargo of 2,641 tons of coal. The night before the attention of her master, Capt. Jones, was called to what then appeared to be steam coming up the ventilator and hatchway, but it became so much denser the next morning that he requested the master of two other ships then in the bay (Capt. Skinner, of the Banduara, and Capt. McRitchie, of the Apaye) to repair on board and with him examine into the cause. That examination disclosed the fact that what at first appeared to be steam was in fact smoke, and that there was fire somewhere in the ship; and it was then deemed best to endeavor to smother the fire, and also to make preparations for the discharge of the coal so as to reach the seat of the fire. Accordingly the captain directed the hatches to be closed, and then went ashore to arrange with the libelant for the discharge of the cargo. This was Sunday afternoon, about 2 or 3 o'clock, and, the day making it inconvenient to get the required men together, and the captain not then

anticipating any immediate danger, he arranged with the libelant for the sending by the latter of lighters and men the next morning to get the coal out. The next morning, Monday, libelant sent lighters and men, and the discharging of the cargo was commenced, the ship's men working in the hold. About 6 o'clock in the morning of that day three of the ship's pumps were put to work pumping water into her wherever they could get it, and this, together with the discharging, was continued as well as possible until midnight, at which time it became impossible for the men to remain in the hold because of the density of the smoke. The hatches were therefore again put down and the ship's pumps continued pumping water into the hold during the night. Meanwhile about 180 tons of coal had been discharged. Early the next morning, Tuesday, Capt. Jones again requested the advice of Capts. Skinner and McRitchie, who, after making a survey of the ship, recommended that she be put aground, and that water be pumped into her hold until the fire should become extinguished. At this time, it was thought, by Capt. Skinner at least, that the fire was both fore and aft, but an examination made after the discharge of the cargo showed the seat of the fire to have been on the starboard side, just abreast of the main mast, where the ceiling of the ship was burned through in several places for a space of about 6 feet in width and 16 feet in length and about 25 tons of coal burned or charred. For the purpose of carrying out the recommendation of Capts. Skinner and McRitchie, Capt. Jones went on shore about 11 o'clock on Tuesday morning, and endeavored to arrange with the libelant for the towing of the ship ashore, and for such other and further services as the exigencies of the case might demand. The libelant was willing to, and did, agree with the captain to tow the ship ashore for a stipulated sum, $500, but would not make any agreement as to compensation for any other or further services, for the reason that it was impossible to anticipate what other or further services would be required; but the libelant was ready and willing to perform such other and further services as should be needed, and did do so upon the request of the captain of the ship, as will presently be stated.

Pursuant to the contract for towage, the libelant's tug-boat Warrior left the Wilmington wharf at about half past 11 o'clock Tuesday morning, reached the ship about 20 minutes to 12, and towed her to the place which had previously, and after an examination of a chart in the office of the libelant, been selected for grounding her by Capts. Jones, Skinner, and McRitchie. In towing the ship to the place thus selected, the captain of the tug-boat was directed by Capt. Skinner, Capt. Jones remaining on his ship and making the necessary soundings. When she came to three and a half fathoms, the port anchor was let go, and it is contended for the libelant that at this point the towage service ceased. At this time the ship was lying broadside to the beach, and was still floating. The Warrior then, by direction of Capt. Skinner, went astern of the ship, and towed her stern onto the beach, the ship meantime paying out chain, and the libelant's tug-boat Catalina took out a small kedge anchor, which Capt. Jones directed to be placed in order to keep the ship straight, with

v.39F.no.10—32

her stern on the beach. It is at this point, and I think rightly, that the claimants contend that the towage service ceased. The purpose had in view by both parties to the contract of towage was the placing of the ship aground, and in no just sense can that service be said to have ended until the anchors were placed to hold the ship in position. That was accomplished about 3 o'clock in the afternoon of Tuesday. The weather was then good, the barometer high, and there was but little swell. There was in the hold of the ship about two and a half feet of water, which had been put there by the ship's pumps and by two others which had been sent on board from the Banduara and the Apaye about 9 o'clock of Tuesday. As soon as the ship was grounded and the anchors placed, the libelant, at the request of Capt. Jones, commenced to pump water into her. The Warrior, except when prevented by the bursting of a hose and the breaking of her connections, which was occasioned by her surging, and which interruptions were in all about two hours in duration, continued to pump until half past 12 Tuesday night, at which time she was ordered off for the reason that it was not deemed safe, either for herself or the ship, for her to remain. The ship was on the ground, and the Warrior was on her starboard side, which was at the time the weather side, and during the afternoon and evening the swell was such that the Warrior parted a number of lines, among them an eight-inch hawser, twice, and two six-inch lines. Her upper and lower guards were also broken, her bits sprung, and her upper and lower fenders broken. During the same time one of the bulwark plates of the ship was cracked, a stern chock broken, and some of her stanchions carried away. The Warrior was therefore ordered off, but kept within hailing distance of the ship. The pumps used by the Warrior were a three-inch syphon, with a rated capacity of 5,000 gallons per hour, under 40 pounds of steam, which in this instance was increased to 85 pounds, and which should have increased the capacity about one-third, and a one and a half inch hose connected with the Warrior's donkey-pump, the capacity of which was about 7,000 gallons at the speed at which it was run, and a small pump which was used during the interruptions referred to. The libelant's tug-boat Falcon went to the aid of the ship at 6 o'clock Tuesday evening, with a six-inch No. 10 Vanduzen suction-pump, with a rated capacity of 14,000 gallons an hour. In this instance the pressure was increased to 85 pounds. She was undergoing repairs in the morning, and it was impossible to get her ready before the hour named. She came up on the port side of the ship, and commenced and, except when interrupted by the breaking of a pipe and the carrying away of the hose from the coupling, caused by the surging of the tug, continued to pump water into the ship during the whole of Tuesday night, and until half past 8 o'clock Wednesday morning, at which time the fire was found to be extinguished, and the pumping ceased. There was then 15½ feet of water in the ship, and while it is impossible to determine with any degree of certainty the relative amount of water put there by the pumps of the ship and those of the libelant's tugs, I think from the evidence that there is no doubt that much the larger quantity was pumped by the latter. The interruptions in the

pumping of the Falcon lasted from an hour to an hour and a quarter, during which time the necessary repairs were made by libelant's engineer by means of fittings and other appliances that he had taken the precaution to provide.

While I think the service rendered by the Catalina in taking out and placing the ship's kedge anchor was a part of the towage service, for which a specific contract was made, the salvage service of the Catalina commenced before that time. When Capt. Jones was on shore Tuesday morning, at his request the libelant placed its superintendent, engineer, blacksmiths, and men, with the requisite tools and appliances, on board the Catalina, and sent her out to aid the ship. The engineer remained in charge of the pumps of the tugs, but the master of the ship decided that he did not need the blacksmiths, and they, with the superintendent, returned to shore, on board the Catalina, about 4 o'clock of Tuesday. As the Catalina was steaming away the captain of the ship requested the libelant's superintendent to send out 35 men to aid in pumping, which was promptly done by means of the Catalina, and those men worked all of Tuesday night, pumping and putting in water by means of buckets. After the fire was extinguished, the captain of the ship was desirous of having the water pumped out of her as speedily as possible. He started the ship's main pump, and portable force pump, and the force pump of the Apaye, and at his request the Falcon went to San Pedro to get a pump for the same purpose. She did so, and reached the ship again, with the pump, about 2 o'clock of Wednesday. Considerable difficulty was experienced in making the tug fast and in finding a suitable place for the pipe, but the pump was gotten to work about 6 o'clock and continued pumping from 10,000 to 11,000 gallons an hour until about half past 3 o'clock the next morning. The Falcon parted several lines while thus engaged, occasioned by surging backwards and forwards, and was in some danger of having her house, smoke-stack, and mast carried away by one of the yards of the ship, which was cock-billed. During the afternoon of Wednesday the libelant, at the request of the captain of the ship, sent a lighter along-side, which would not have been done but for the perilous position of the ship, for the purpose of taking out coal, and a considerable quantity of coal was thus discharged. The lighter was in good condition when this service was commenced, but was damaged by it so that it leaked, but to what extent does not appear. About 3 o'clock Wednesday night the ship floated, and the pumping then ceased. There was then four feet six inches of water in her. As soon as the chain and anchor were hauled in, to accomplish which consumed several hours, the ship was towed to her former anchorage by the Warrior, which she reached about 6 o'clock Thursday morning. During the time the ship was on the ground she was undoubtedly in a dangerous position, not only because of the existing fire, but because the coming on of bad weather might, and almost certainly would, have made a wreck of her. It is true that during the time she was aground the barometer was high and the weather was good, and so continued for some weeks after, but there was sufficient swell to cause the damage al-

ready mentioned, and to cause the ship to thump quite heavily; and during the night of Tuesday the sky was overcast. It also appears from the evidence that during the month of April severe south-easterly winds are very rare at San Pedro, but that westerly and south-westerly winds frequently come up, and sometimes very strong and suddenly; and also that at times off shore winds cause a heavy swell in that bay. In cases of this nature there is no standard by which can be absolutely measured the compensation to which the party rendering the service is entitled. Each case depends in large measure upon its own circumstances. While it is perfectly true that salvage is not a "question *pro opere et labore*, but rises to a higher degree, and takes its source in a deeper policy," there is a broad distinction, as said by Dr. Lushington, "between salvors who volunteer to go out and salvors who are employed by a ship in distress. Salvors who volunteer go out at their own risk for the chance of earning reward, and if not successful they are entitled to nothing, the rule being that it is success that gives them a title to salvage remuneration. But if men are engaged to go out to the assistance of a ship in distress they are to be paid according to their effort, even though the labor and service may not prove beneficial to the vessel or cargo." *The Undaunted*, 1 Lush. 90; *The Sabine*, 101 U. S. 390. In the one case the reward should be more liberal than in the other. Here the services of the libelant were rendered at the request of the master of the ship, for which it was entitled to be paid whether such services were beneficial or not; and although the services were rendered with promptness and efficiency, there was not manifested any disposition on the part of the libelant to take any chance of earning reward, but, on the contrary, it appears that the libelant was unwilling to send the Falcon to aid the ship unless her master requested that it be done. Under such circumstances, while the libelant should be awarded a sum in excess of the actual value of the services rendered and the actual damage done to its property engaged in the service, and while such excess should be liberal, it should not, in my judgment, be measured by that high standard that would control the award had the services been rendered voluntarily. The proof shows the actual value of the services rendered by libelant and the actual damage done to its property engaged in the service to be $1,510.41, which, of course, will be allowed. The value of the ship was $48,000, and of her cargo and freight $23,790. The value of the Warrior and Falcon was $30,000 each, and of the Catalina $10,000. These tugs are maintained at San Pedro for the purpose of rendering towage, salvage, and other services, at an expense of about $6,000 per month, and, with the exception of a small tug, the McPherson, at San Diego, which is distant about 100 miles from San Pedro, and a small tug, the Pelican, at Redondo beach, about 10 miles distant, are, as appears from the evidence, the only tugs maintained along the coast between San Diego and San Francisco. Considering all of the facts and circumstances of the case, I think $3,000 over and above the actual value of the services rendered and the actual damage done, making in all $4,510.41, is a fair sum to be awarded the libelant, for which amount, with costs, a decree will be signed.