MOUNTFORD (WILMARTH v.). See Case No. 17,774.

MOUNTJOY (UNITED STATES v.). See Cases Nos. 15,828 and 15,829.

MOUNT PLEASANT (FOOTE v.). See Case No. 4,914.

## Case No. 9,887.

The MOUNT WASHINGTON.

GEIGER v. The MOUNT WASHINGTON.

[4 Adm. Rec. 523.]

District Court, S. D. Florida. Nov. 3, 1851.

SALVAGE — IN DISTRESS — PERIL — NUMBER OF SALVORS—FORFEITURE.

[1. Compensation in the nature of salvage may be awarded for services rendered to a vessel in distress, although she was in no imminent peril of loss.]

[2. Other things being equal, the total award of salvage should vary with the degree of peril from which the property was saved.]

[Cited in The Calcutta, Case No. 2,298.]

[3. In fixing the total award, the number of salvors necessary to perform the services may be considered, but not the number actually employed.]

[4. The fraudulent employment by a salvor of an unnecessary number of assistants in order to magnify the importance of the services should cause a forfeiture of all compensation.]

[This was a libel for salvage by John H. Geiger and others against the ship Mount Washington and cargo (Blaisdell, master and claimant).]

Wm. W. McCall, for libelants.

S. R. Mallory, for respondent.

MARVIN, District Judge. The principal facts in this case are as follows: The ship Mount Washington (Blaisdell, master), while on a voyage from New Orleans to Bordeaux, about the 22d of August last, encountered a heavy gale, and lost her jib boom, foremast, and sails attached. When the gale subsided she came to anchor in about five fathoms water near the west end of the Quicksands, about forty miles west of Key West. The ship had leaked badly during the gale, and the cargo had changed its position, making her careen considerably. After the gale was over the master pumped out his ship, and did what he could to get the ship righted. He also erected a jury foremast and rigged jury sails and he was getting ready to proceed to sea, with the view to go into the port of Key West or Havana for repairs, when, on the 24th of August, he was boarded by the libelant Geiger, master of the wrecking schooner Champion, who was then on a cruise for vessels in distress. The master of the ship employed Geiger to assist him in getting the ship to Key West, wanting his services

as a pilot. The schooner Lafayette arrived at the ship about the same time. The direction of the ship being given up to Geiger, he got her under weigh, and stood towards the reef to the southward, and tacked and stood in again. On attempting to tack the second time, the ship misstayed, and it was soon ascertained she would not obey the helm, and, indeed, that the rudder post was split and broken. Geiger says that the ship was totally "unmanageable," attributing her staying at the first tack to a favoring tide and sea, and not to the efficiency of the rudder. Finding the ship would not stay, and the wind being ahead, so that it was necessary to beat the ship, making short tacks, he placed the schooners Champion and Lafayette ahead of the ship, and towed her. He subsequently placed the schooner Louisa also ahead, and finally the Euphemia, all employed in towing the ship. He arrived with the ship at Key West on the 27th. The winds were light, and the weather pleasant.

Such are the principal facts in the case. Geiger and the master of the ship do not materially differ in their relation of the facts; but Geiger alleges, as a matter of opinion, that, but for the services rendered by him and his consort, the ship and cargo would have been lost. He claims, therefore, salvage. The master admits the usefulness of the services, but alleges, as his opinion, that the ship and cargo would not have been lost, had no such services been rendered. It is very certain that Geiger and his associates are entitled to compensation for the services rendered, and whether this compensation is called "salvage," or simply "compensation," is really of no practical importance. It is true that salvage, in the legal acceptation of the word, and eo nomine, is allowed only for services which result in saving property from the perils of the sea. In this sense of the word, there must be, as a foundation for salvage, impending and imminent peril, and a saving from that peril. But compensation, larger or smaller, in the nature of salvage, is allowed by the court for services to property on the high seas, when such property is not in imminent peril, or perhaps in very little peril, of total loss; the amount of this salvage, or this compensation made, to vary with the varying circumstances of each individual case. So that the circumstances of each case must be considered, and a remuneration fixed either as a salvage eo nomine, or as a compensation in the nature of salvage. In fixing the amount of compensation for marine services, the various circumstances constituting the imminency of the danger to which the property was exposed, and from which it had been saved, the value of the property, the labor of the salvors in saving it, their gallantry, good conduct, and many other circumstances, all enter into the calculation, and are duly considered, as well as considerations of public policy, which prompts a liberal reward for salvage services, in order to advance the interests and promote the security of commerce generally. But in every case of a claim for salvage or compensation the great and important element in the calculation, in fixing the amount, constantly is, the condition and situation of the property in regard to its exposure to peril or danger of loss or destruction,—what was the peril or danger, if any, and the extent thereof; and according to the extent of this danger, all other things being equal, will the compensation or salvage be.

Let us now consider the question of danger in this case. Was this ship, at the time Geiger went to her, in peril of total loss? The true answer to this question will result from a consideration of her condition and situation. She lay at the west end of the Quicksands, at anchor in five fathoms of water, with an open sea to the southward, and no reefs so near as to interfere with his getting under weigh. Was there danger in this position? I do not see it. She had lost her foremast and jib boom. But the master had erected a jury foremast, and had got sail upon it. He had also rigged up a jib. Was she, in consequence of the loss of her foremast and sails, in danger of total loss? Her security may have been thereby somewhat diminished; but I do not think that it can properly be said that the ship, well manned and commanded as this ship was, is, in ordinary weather, in danger of loss simply because she has a jury foremast and a bad-fitting jib. But adding the further fact that her rudder was broken, and she steered badly, or would not steer at all, and still I think it cannot be said with truth that the ship was in danger of total loss. An experienced shipmaster like Captain Blaisdell knows very well how to repair or remedy the defects of a broken rudder, or how even to navigate the ship without a rudder, when necessary. It is very evident that this is the view which Captain Blaisdell himself took of the matter at the time. He wanted a pilot. He says he proposed to Geiger to pilot him, not that he considered his ship in any danger, but that it had become necessary, in consequence of the gale, to go into port, and the services of a pilot would be useful to him. He knew his position, and could himself navigate the ship into Havana or Key West without a pilot; but a pilot would be very useful to him, in giving him confidence, and enabling him to take advantage of tides, currents, &c.

It appears to me, upon a careful consideration of the facts and circumstances of the case, that this ship, at the time Geiger went on board, was in little or no danger of a total loss, but that the probability, decidedly, is that, had no person gone to the ship, Captain Blaisdell would himself, unaided, have navigated his ship into this port, or the port of Havana. Such I think must be the opinion, too, of all candid men possessing any considerable nautical ex-

perience. Indeed, when we consider that the gale was over, the weather good, the ship snugly at anchor, and not leaking badly, and that the ship had two good masts and a jury foremast, and was within forty miles of this port, with an experienced commander and an efficient crew, it may well be doubted whether it was not the duty of Captain Blaisdell to have declined altogether the services offered by Geiger, and to have carried out the purposes and views he entertained before the arrival of Geiger at the ship. But Captain Blaisdell thought he needed the pilot, and employed Geiger accordingly. I think the unconditional employment of Geiger under the circumstances, was probably excusable. It was evidently done in good faith, and, without doubt, it appeared to the master to be advisable and proper; and I think it was. But I do not think that a pilot, even, was indispensably necessary to the safety of the ship,—much less the employment of any vessels in towing the ship necessary to her safety. The rudder could have been repaired, or, if not, the ship could have been anchored in safety, and navigated to this port when the wind should become more favorable.

The very most, it appears to me, that can possibly be claimed, truly and fairly for Geiger's services, is that they were very proper, and, under the circumstances, allowable. and necessary to get the ship to this port in the shortest time, and with satisfaction to the master; but it cannot be said that they were necessary to the ship's safety, or that they contributed to save the ship, for I do not consider her as having been in danger. Salvage, therefore, eo nomine, is not due; but a fair and reasonable compensation for the services rendered. In estimating the value of these services, and fixing the amount of compensation to be allowed therefor, I consider the services of Geiger and the schooner Champion and crew as useful, and proper to be paid for, not that I consider either as necessary to the safety of the ship; but they were useful and necessary to get the ship into port in good time, and without too much labor and anxiety. The services of one vessel and crew are therefore to be paid for. The services of the Louisa, the Lafayette, and the Euphemia were no further useful than as they contributed to get the ship into port perhaps a day or two sooner than she would have arrived without them. These vessels did no hurt; they did some good; and there is no objection to their employment. But there is no principle or usage or practice of this court, or of any other, that indorses or in any way sanctions the idea of allowing a larger compensation in the nature of salvage, or a larger salvage, for services rendered by a larger number of salvors than would be allowed for the same services rendered by a less number. The compensation cannot be increased by increasing the number of salvors. On the contrary, it has been the steady practice of the court to adjust its amounts of salvage in each case

with reference, not to the number of vessels and men actually employed, but with reference to the number necessary to do the service. In determining what number, in any particular case, was necessary, much, often, would have to be left to the judgment of the parties interested and on the spot. But in no case has this court ever increased the amount of salvage in consequence of there being a larger number of salvors, where it has been apparent at the time that a less number would be sufficient. I have above remarked that there is no objection to the employment of the Louisa, the Lafayette, and the Euphemia. They did no hurt, and did some good. Their employment ought not to diminish the compensation to be allowed for the service actually rendered; for their employment seems to have been in good faith, and the reasons assigned for it are satisfactory. But did the facts and circumstances of the case fully satisfy me that these vessels had been employed with the view to magnify the importance of the services, and to make out an apparently strong case of salvage, with a view to a larger compensation than the real facts would fairly warrant, there would be no doubt in my mind as to what the law would require me to decree. Such conduct works a forfeiture of all salvage or compensation. The law just as much exacts fairness and honesty in the salvors in presenting a claim of salvage to the court as it does fidelity and honesty in preserving the property from embezzlement. Salvors are not to impose on the master of the ship or vessel, nor on the court, but to conduct themselves fairly and honestly in regard to both.

To return to the question of compensation: The case of The Herman [Case No. 6,406], decided in this court in 1840, is somewhat analogous to the present case. That ship got ashore on Alligator reef, and drove over, knocking off her rudder. Bethel and Roberts piloted the ship into this port steering her by the sloop Texas. The court decreed $800. That ship was in as much danger as this. She was inside the reef, and without a rudder. In that case, however, the ship was to windward of the port, and could be more easily brought in. More time and labor were required to bring this ship in. Upon the whole, I think that $1,500 is a suitable compensation to be decreed for the services rendered.

It is therefore, ordered, adjudged, and decreed that the sum of fifteen hundred dollars be allowed the libelants for their services rendered said ship Mount Washington as alleged by them in their libel, and that upon the payment thereof and the costs and expenses of this suit, the wharfage, storage, and bills for labor, the marshal restore said ship to the master, for and on account of whom it may concern. It is further ordered that the marshal proceed to advertise and sell at public auction a lot of old brass taken from the old rudder, and whatever other old material the master may desire to have sold.