PACIFIC MAIL S. S. CO. v. COMMERCIAL PACIFIC CABLE CO.

COMMERCIAL PACIFIC CABLE CO. v. PACIFIC MAIL S. S. CO.

(Circuit Court of Appeals, Ninth Circuit. September 7, 1909.)

No. 1,687.

1. SALVAGE (§ 16*)—THEORY AND PURPOSE OF REMUNERATION—SERVICES RENDERED UNDER EMPLOYMENT.

The principles which govern the allowance of compensation for a salvage service are not the same where the service is rendered under an employment and where it is volunteered. In the latter case it is more meritorious, and the salving vessel takes the risk of receiving nothing if the service is unsuccessful, and if successful is entitled to a liberal reward; while if employed she is entitled to payment on a quantum meruit in any event, and whether entitled to more in case of success depends on the circumstances and the spirit in which the service is rendered.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 29; Dec. Dig. § 16.*]

2. SALVAGE (§ 30*) — AMOUNT OF COMPENSATION — SERVICES RENDERED UNDER EMPLOYMENT.

The steamship Manchuria grounded on a coral reef in the bay of Waimanalo on the northeast side of the island of Oahu, Hawaii. Being unable to free herself with the aid of three other vessels which went to her assistance, the owners' agent applied for the assistance of libelant's cable ship, Restorer, a vessel of 4,000 horse power, then lying idle at Honolulu. Libelant's superintendent stated that she could not go without permission from New York, which was cabled for and obtained. In the meantime the master refused to fire up unless the expense was guaranteed, and such guaranty was given. On receiving permission libelant's agent required a written request for her services, which being given, the Restorer went to the assistance of the Manchuria; but her efforts, added to those of the other vessels, were unsuccessful, and on the next day an expert salvor employed by the underwriters with a powerful wrecking outfit started from San Francisco, arriving nine days after the stranding. In the meantime the Restorer and other vessels had assisted in keeping the

Manchuria in position and from further injury, and she was retained by the expert who took charge of the work, and who understood that she was under employment, until the Manchuria was finally released. Throughout libelant and its representatives worked with a view to making as large a salvage claim as possible. The Restorer was at no time in any special peril, nor did it appear that her services were indispensable to the safety or rescue of the Manchuria. *Held*, that she was entitled to recover for her consumption and loss of stores and expenses on account of the salvage operations, and to a per diem allowance for the time employed, but to no bonus in addition as a purely salvage reward.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74; Dec. Dig. § 30.*]

Appeal from the District Court of the United States for the Territory of Hawaii.

Charles Page, E. B. McClanahan, and S. H. Derby, for appellant and cross-appellee.

M. F. Prosser, Robbins B. Anderson, and Sidney Ballou, for appellee and cross-appellant.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge. The very voluminous record in this cause renders it impossible to review the evidence in detail in an opinion of reasonable length, so that we will not undertake to do more than indicate the grounds upon which we rest our judgment.

The appeal of the Commercial Pacific Cable Company, which was the libelant in the court below, is upon the ground that the amount awarded it by the trial court was inadequate, and that the court also erred in dividing, as it did, costs between the respective parties. What we shall say in respect to the main appeal, which is that taken by the Pacific Mail Steamship Company, the claimant, will dispose of the appeal taken by the libelant as well.

The action was in rem against the claimant's twin screw steamship Manchuria for salvage, and resulted in a decree by the court below awarding the libelant $62,636.80, and dividing the costs between the libelant and claimant. It appears from the record that about 4 a. m. of August 20, 1906, the Manchuria, which was of 13,638 tons gross, and 8,750 tons net, register, ran upon a coral reef in the bay of Waimanalo on the northeasterly side of the island of Oahu, and there stranded. The place of stranding was on the lee shore, several hundred yards from the shore line, and less than a mile from the landing place of the Waimanalo Sugar Company. Waimanalo Bay is an open roadstead with a northern exposure, but at the time of the stranding of the Manchuria the water and sea were moderate, and the time of year was such that storms were not to be anticipated. The city of Honolulu is on the opposite side of the island, about 15 miles distant by wagon road, and within about two or three hours' steaming distance. Immediately upon the stranding of the ship one of its officers was sent to Waimanalo, and by telephone notified Hackfeld & Co., the ship's agents at Honolulu, of the accident. Both the engines of the Manchuria were reversed, and the full power of her propellers used, as

soon as the reef was struck, in an attempt to back off, but without success. Within a few hours thereafter, to wit, about 9 o'clock in the morning of August 20th, the tug Fearless, of 700 horse power, and especially fitted for salvage work, arrived from Honolulu, and by means of a line to the ship attempted to aid in her effort to back from the reef. About 10:45 of the same morning the United States revenue cutter Manning, of 2,500 horse power, and the steamer Maui, of 447 horse power, arrived, and by means of lines therefrom to the distressed ship commenced aiding in the effort to release her. During the afternoon the ship ran out her stream and one bower anchor and emptied her ballast tanks, but still remained stranded. Other vessels during the morning and afternoon came to the assistance of the Manchuria, and were used in transferring her cabin and steerage passengers and their baggage to Honolulu. At the time of the accident the libelant's cable ship Restorer was lying idle, with cold boilers, in the port of Honolulu, where she had been stationed since April 24, 1905. She was a vessel of about 4,000 horse power, of the value of about $600,000, and was maintained by the Cable Company for service in the repairing of its cables in the event of need. In the evening of the day of the stranding of the Manchuria, Hackfeld & Co. asked the master of the Restorer, who was Capt. Combe, and the superintendent of the Cable Company's business at Honolulu, Mr. Gaines, whether the Restorer could be sent to the assistance of the Manchuria. They replied that she could not without express authority from the home office in New York. They were then requested by Hackfeld & Co. to cable for such authority, and while waiting for a reply to get up steam in the Restorer's boilers in order to save time, which they agreed to do provided payment of the expenses of getting up steam was guaranteed them in the event the home office declined to grant the requested assistance. Hackfeld & Co. thereupon gave such guaranty, after which, to wit, about 10:30 p. m. of August 20th, the request was cabled and the Restorer's fires started. The next morning a reply was received authorizing the Restorer to go to the assistance of the Manchuria, whereupon Gaines asked and received from Hackfeld & Co. a written request for the assistance of the Restorer, and at 3:07 in the afternoon of August 21st, that ship left Honolulu for Waimanalo Bay, which she reached about 6 o'clock in the evening, according to the testimony of Capt. Combe. He anchored from a quarter to half a mile from where the Manchuria lay. Being asked by his counsel what he did on his arrival in respect to the Manchuria, Capt. Combe answered:

"I did nothing, sir, until the morning of the 22d. I just sent my chief officer on board that evening when I arrived. Q. Why did you do nothing that night? A. Well, I arrived there at about 6 o'clock in the evening. It being a strange place, and not having any soundings, and on a lee shore, I decided for the safety of the vessel—it was getting on nighttime—that I would stop where I was until daylight. Q. What did you do at daylight? A. I hove up anchor and came up closer to the position of the Manchuria. Q. And then what did you do? A. Gave them a couple of grapnel ropes."

The evidence shows that by far the heaviest damage suffered by the Manchuria was sustained prior to the arrival of the Restorer. The unsuccessful result of the first day's attempts to release the Manchuria

was cabled to the claimant at San Francisco by its Honolulu agents the next day, to wit, August 21st. In doing so the agents gave the claimant this information:

"Manchuria overnight sagged little. Same position. Rolling, pounding heavily. Rough sea. Fresh wind. Making little water; No. 3 starboard one foot. No. 4 port bilge ten inches, in twelve hours. Port engine shaking. Main steam pipe broken 2 a. m. Saddle of double end and single end boilers cracked. Starboard engine moves little in pounding. No signs of hull getting weak. Will secure vessel hold in same position."

In reply they were instructed on the same day that Capt. Metcalfe, Lloyd's and underwriters' agent, and an expert salvor, would leave San Francisco on the 23d with a powerful wrecking outfit, and that he recommended that the ship's anchors be so placed as to prevent the vessel from going further on the reef and twisting broadside, and that the vessel should be kept as deep in water as possible until the anchors should be properly laid; that no part of the cargo should be removed unless it appeared certain that there was no risk of the vessel going further on the reef; that his opinion was that the vessel would have to be floated largely by warping, and could not be pulled off by towing alone. Capt. Metcalfe and his assistant, Capt. Pillsbury, with a large wrecking outfit, reached the Manchuria in the afternoon of August 29th, and thereupon took charge of the salvage operations. In the meantime—that is to say, from the cessation of the unsuccessful attempts to pull her from the reef—the efforts of those in charge of the disabled ship were directed towards holding her in her then position, in which efforts the Restorer participated from and including the morning of August 22d, having during that time four of her grapnel ropes on the Manchuria, which she pulled and stopped pulling as ordered by the Manchuria. These grapnel ropes were ropes of wire wound with hemp, designed for grappling deep sea cable, each having a breaking strain of from 16 to 18 tons. In adjusting them they were wound over the large cable drum of the Restorer, so that they could be taken up inch by inch if necessary, and were adjusted so that they hung in parallel curves, equalizing the strain to some extent. During the same intervening time the steamers Manning and Maui and the tug Fearless rendered service in the same behalf, and the Manchuria herself put out numerous anchors. Extensive soundings were also taken of the waters of the bay surrounding the ship, much of the Manchuria's cargo was shifted, and everything was put in as good condition as possible preparatory to the arrival of Capt. Metcalfe and his outfit. During the same time the Restorer also furnished a grapnel rope to the Manning, which was broken, after which she gave it to the Manchuria to use on her anchors. Capt. Combe, of the Restorer, also participated in the soundings referred to, furnished a chart and cable buoys for running lines over the coral, and assisted in laying anchors.

On the arrival of Capt. Metcalfe he ordered the Restorer's engines stopped and her lines cast off from the Manchuria, and cabled to the claimant's representative in San Francisco to know what arrangement had been made concerning the services of the Restorer, in response to which inquiry he was informed by cable that the Restorer's charges would be adjusted in New York, and to "use as necessary," whereupon

he furnished the Restorer with a 4½-inch plow steel cable in place of her four grapnel ropes, and made such use of her thereafter as he saw fit, in connection with the numerous steam and other craft engaged in the work in hand. The record shows that from the time of Capt. Metcalfe's arrival until the forenoon of September 14th the preparatory work of laying the wrecking anchors, discharging the ship's cargo, and installing additional pumps was vigorously and unremittingly carried on, involving the labor of a large number of men, as well as the assistance of various boats of one kind and another. On the 14th of September an attempt was made to pull the Manchuria from the reef. A strain was put on the moorings laid out from her, and the towing vessels, consisting of the Restorer, Manning, Iroquois, and the tug Eleu, pulled as directed. The result was thus reported by cable on September 14th to the claimant at San Francisco, by Capt. Metcalfe:

"After great difficulties moved Manchuria out 250 feet, altering stern to N. by E. ¼ E.; originally N. by W. Unable to haul vessel's stern to eastward account vessel having twelve degrees port list, burying bilge keel sand and coral. Will keep on heaving, although, owing to vessel going nearly straight astern, most of our anchors are too far to eastward. All coal discharged except sufficient to supply our needs for steam. All prudent water ballast pumped out."

As indicated in this cable, the movement was not in the direction anticipated or desired. Accordingly it was determined to shift the towing vessels more nearly astern, with a view to a further effort to move the ship, which was done under the direction of Capts. Metcalfe and Pillsbury; the tug Eleu being sent to help keep the bow of the Restorer to the wind during the operation, and the sea bottom around the ship's stern being dynamited in order to break up the coral. The Restorer attempted to make the shift without letting go her line to the Manchuria. In making the maneuver the Restorer crossed the bows of the Iroquois further inshore, and was dragging her anchors toward the coral reef, when she finally, by letting out sufficient anchor chain and slacking her towing hawser, was brought under control. The difficult work of warping the vessel from the reef commenced, and about noon of September 16th she was floated, and towed to Honolulu by the Restorer, and, after the making of temporary repairs, sailed to San Francisco under her own steam.

The expenditures in the salvage operations from the time of the stranding of the ship to the time of her release amounted to $126,-248.91, not including the services of the United States revenue cutter Manning, nor the services of the tugs Fearless, Iroquois, or Eleu, nor the services of the schooner Melacthon, the towing lighter Pioneer, the steamer James Makee, the steam dredger Pacific, nor the steamship Niihau, nor the fee of Capt. Metcalfe. The permanent repairs to the vessel exceeded $500,000. The original cost of the Manchuria was $2,061,349.42. At the time of the accident she seems to have been valued by the claimant at $1,800,000, although it is contended on the part of the libelant that it was then about $2,563,000. The libelant claimed for the services of the Restorer $300,000, and it was for that sum that it libeled the ship, contending that it was the chief agent in the operations which ultimately rescued her from her perilous position. In respect to that contention the court below said, in its opinion:

"The heavy salvage of $300,000 claimed by the libelant is based upon its theory of the case, as shown by the pleadings and by evidence introduced in support thereof, that the Restorer, as operated by those in charge of her, was the chief agent in the operations which ultimately effected the removal of the Manchuria from her dangerous position to a place of safety. I have no difficulty in finding that this theory is not borne out by the evidence. I need not go into a discussion of the grounds for such conclusion, more than to say that my mind has been irresistibly led by the evidence in the case, and by my examination, with counsel for both parties, of the steam winches of the steamship Mongolia, which were conceded by both sides to be the counterpart of those of the Manchuria, to this view, and to the nearly correlative conviction that to the steam winches of the Manchuria, acting upon anchors fixed upon the sea bottom, was mostly due the work of moving her from the bed in the reef where she was lying, which must be regarded as by far the most difficult and most important part of the salvage operations."

The court below also took notice of the undisputed fact that the libelant was not a volunteer, but contributed the services of the Restorer upon request only, without any specific agreement at the time as to her compensation. Said the trial court:

"This being the case, although libelant would have been entitled to remuneration at law, if not in admiralty, on the basis of quantum meruit, if the salvage operations had failed, yet, success having been achieved, the ordinary principles of salvage compensation would be applied, if its services contributed to the salving of the libelee."

The court below also found against the contention of the libelant that its services were effective in preventing the Manchuria from being carried further towards the shore by the sea from the bed in which she lay when the Restorer arrived. A careful consideration of the record satisfies us that the trial court was quite right in each of the above-mentioned findings in respect to the services of the Restorer; but that court further found that that vessel "was of material assistance to the Manchuria's own anchors in preventing her from swinging to a position more broadside on to the shore than the Restorer found her on the morning of August 22d; was of material service in swinging her stern outward from the shore during the period from August 25th to August 29th, as set forth above, in which movement she was the chief agent, being assisted by the United States revenue cutter Manning during a part of that period, and the four stern anchors of the Manchuria as above stated; was of material service, which, however, is not to be compared with the united power of the steam winches of the Manchuria, in the final operations of September 14th and 16th; and was of material service in towing the Manchuria when floated to the port of Honolulu"—all resulting in a finding and decree "for the libelant in the sum of $5,219.53 for consumption and loss of stores and expenses on account of salvage operations, and in the sum of $56,000 for salvage proper, making a total of $61,219.53."

Based upon the contention that it appeared from the decision of the court that the said award for salvage proper of $56,000 was estimated upon an allowance of $2,000 a day for the services of the Restorer, the claimant asked the court, by motion, to reduce the allowance for salvage proper by $4,000 because of the fact that the Restorer was only engaged in the service for the period of 26 days. The record shows these proceedings upon the hearing of that motion:

173 F.—3

"Mr. Olson, of proctors for claimant. read motion to amend decision.

"The Court: Before you go on, I will call your attention to the fact that it is a miscalculation. The court did not calculate it on the basis of $2,000 a day; but for $1,000 a day, and the rest of it is made up by other amounts.

"Mr. Olson: We were unacquainted with that fact. We drew our information from the decision itself.

"The Court: That is 26 days at $1,000 a day, and in addition to that, for the value of its services, there are three items; and it was the other items which made up the balance of the award.

"Mr. Olson: Well, that puts a different face upon the matter entirely.

"The Court: I can understand how such an estimate was made, but I think the estimate of the value of her services, I have it; I think it was $10,000 the value of her services in pulling her off, $10,000 value of her services in swinging her, and $10,000 the value of her services in steadying her; I think it was something like that, making $30,000, in addition to $1,000 per day for 26 days. That would be $56,000."

It thus appears that the allowances made the libelant by the court below for the services of the Restorer were as follows: $5,219.53 for consumption and loss of stores, and expenses on account of salvage operations; $1,000 a day for the time of her employment, to wit, 26 days, and an additional $10,000 for her services in steadying the Manchuria, an additional $10,000 for swinging her, and an additional $10,000 for pulling her. As has been shown, the view of the law entertained by the court in approaching the consideration of the case was that, notwithstanding the fact that the libelant was not a volunteer, but undertook the services only upon express employment, "yet, success having been achieved, the ordinary principles of salvage compensation may be applied, if its services contributed to the salving of the libelee." In holding that "the ordinary principles of salvage compensation" are applicable to such a case, the court below erred.

In Wilmington Transportation Company v. The Old Kensington (D. C.) 39 Fed. 496, 500, which was also a case for salvage, it was said:

"In cases of this nature there is no standard by which can be absolutely measured the compensation to which the party rendering the service is entitled. Each case depends in large measure upon its own circumstances. While it is perfectly true that salvage is not a 'question pro opere et labore, but rises to a higher degree and takes its source in a deeper policy,' there is a broad distinction, as said by Dr. Lushington, 'between salvors who volunteer to go out and salvors who are employed by a ship in distress. Salvors who volunteer go out at their own risk for the chance of earning reward, and if not successful they are entitled to nothing, the rule being that it is success that gives them a title to salvage remuneration. But if men are engaged to go out to the assistance of a ship in distress they are to be paid according to their effort, even though the labor and service may not prove beneficial to the vessel or cargo.' The Undaunted, 1 Lush. 90; The Sabine, 101 U. S. 390, 25 L. Ed. 982. In the one case the reward should be more liberal than in the other. Here the services of the libelant were rendered at the request of the master of the ship, for which it was entitled to be paid, whether such services were beneficial or not; and, although the services were rendered with promptness and efficiency, there was not manifested any disposition on the part of the libelant to take any chance of earning reward, but, on the contrary, it appears that the libelant was unwilling to send the Falcon to aid the ship unless her master requested that it be done. Under such circumstances, while the libelant should be awarded a sum in excess of the actual value of the services rendered and the actual damage done to its property engaged in the service, and while such excess should be liberal, it should not, in my judgment, be measured by that high standard that would control the award had the services been rendered voluntarily."

In the case from which the foregoing quotation has been taken there was not only promptness, but no lack of good faith, nor any mercenary spirit shown on the part of the salvor, such as is claimed to have been shown on the part of the libelant in the present case. That the law is as indicated in the decisions above cited was also decided by this court in the case of The Elmbank, 69 Fed. 104, 108, 109, 16 C. C. A. 164. See, also, The Queen of the Pacific (D. C.) 21 Fed. 460, 471; The Sandringham (D. C.) 10 Fed. 556, 570; The John Gilpin, 13 Fed. Cas. 675, 678; 24 Encyc. of Law, 1206; The Kate B. Jones [1892] P. D. 336, 7 Asp. Mar. Cases, 332; The Beularig, 14 P. D. 3; The Endermore, 7 Asp. Mar. Cases, 334; The Mark Lane, 15 P. D. 135, 137; The Lustre, 3 Haggard, Adm. 154.

As a matter of course, the libelant was entitled to fair compensation for the services of the Restorer, which the court below fixed at $1,-000 a day, with which award, in view of the record, we are not disposed to interfere. Nor can we say that the $5,219.53 awarded the libelant for consumption and loss of stores, and expenses on account of the salvage operations was too much. Whether the libelant is justly entitled to a bonus in addition to those allowances, and, if so, in what amount, depends upon the facts and circumstances hereinafter referred to. Even if the Restorer was entitled to any bonus, we think the trial court attributed to her efforts too much effectiveness, as well as exaggerated the risk to her. In respect to the risk to the Restorer, we think the evidence shows it to have been very slight. Both sea and weather were moderate, and we are unable to see where there was any danger to a well-appointed, powerful steamer, such as the Restorer was, in doing what she did, unless it be in the maneuver of September 14th, directed by Capt. Metcalfe and his assistant, Capt. Pillsbury. In respect to that maneuver the log of the Restorer is as follows:

"2:00 p. m.    Weighed anchor and set on for fresh position as advised by Captain Pillsbury.
"3:00 p. m.    Brought up with star, anchor in 7 fms. water, finding anchor dragging, with 30 fathoms chain out paid out hawser with end fast to 6x3 grapnel rope.
"3:10 p. m.    Signaled for launch. Captain Pillsbury boarded ship.
"3:20 p. m.    Ship still dragging and drifting on lee shore, paid out to 60 fathoms.
"3:55 p. m.    Signaled for tug Fleu, passed end of 8" hawser aboard, hove up anchor, and proceeded to position, where Captain Pillsbury let go mark buoy."

As has already been said, the maneuver was directed by Capt. Metcalfe, after the Manchuria had been unexpectedly moved almost directly astern some 250 feet, where she had stuck fast. The then towing vessels were the government vessels Iroquois and Manning and the Restorer. The movement directed was executed by the government vessels without difficulty; but the Restorer, although given the aid of the tug Fleu, got beyond the position to which she was assigned, and, her anchor dragging, she began to drift towards the shore. Capt. Metcalfe then sent Capt. Pillsbury to the Restorer to see what the trouble was, and on Capt. Pillsbury's arrival on board he suggested to Capt. Combe to stop his port engine, pay out more chain, and slack up on the

towline, which was done, and the threatened peril thus avoided. The sole fault seems to have been that of Capt. Combe.

Capt. Carter, of the government vessel Iroquois, was questioned, and answered as follows:

"Q. Do you remember the maneuver made by the Restorer and referred to herein as having been made on the 14th of September? A. I do. Q. Was it or was it not one similar to the one made by your ship? A. The object of it was; yes. Q. I am not asking the object. Was it a similar maneuver? A. No. Q. In what did it differ? A. She went in closer to tow her than I did. Q. I understand that your boat was third in order of placement before the maneuver was made? A. Yes. Q. First the Manning, then the Restorer, then the Iroquois—is that correct? A. Yes. Q. Can you state whether the maneuver was intended to keep those three boats in their relative positions? A. That was my understanding of it; yes. Q. Was the Restorer, prior to making the maneuver, anchored? A. She was anchored or moored. Q. Forward? A. Yes. Q. With the line running from the stern? A. Yes. Q. In making this maneuver referred to on the 14th, did she lift her anchors? A. She did. Q. In making the maneuver on the part of the Iroquois, what was necessary and proper to be done in order to do it? A. Pick up the anchor, go ahead with the starboard helm, get the right position, and let go the anchor again. Q. What would assist the Iroquois following that procedure to take the position required? A. The wind was favorable to do it. Q. Sea favorable? A. Wind and sea both favorable. Q. What direction did the wind and sea incline to take the Iroquois after the anchors had been lifted with reference to inshore or outshore? A. Take her inshore. Q. What was the use— What was the method employed by the Iroquois to keep her line running to the Manchuria from fouling her propeller in making the maneuver? A. We kept men to keep it turning in the right direction, so that it would keep clear of the propeller. Q. What kept the line comparatively taut? A. Going forward on the engines. Q. The forward movement of the engines? A. Yes. Q. Can you state anything other than sea, wind, and the use of your engines and helm that would be proper and necessary to accomplish that maneuver? A. I accomplished it without anything else. I did not think anything else was necessary. Q. Did you accomplish it properly? A. No. Q. Why not? A. I was interfered with by the Restorer. Q. Will you please explain now why it was and how the Restorer interfered with your accomplishing the maneuver properly in the first place? A. She got across my bow, and I was afraid that her line would foul my propeller or anchor. Q. What did you do when you found this condition of affairs? A. In order to keep from going too far in, I let go the anchor. Q. Did the Restorer actually cross your bow? A. She did. Q. Taking this third place, rather than the second, as I understood, in the position? A. Yes. Q. Do you know whether, at the time of crossing your bow, she dropped her anchors? A. I did not see her drop any anchor. Q. Did you observe the Restorer's maneuver? A. I did. Q. While it was being made? A. I was on the bridge when it was being made—the bridge of the Iroquois. Q. And observed it? A. Watched it all the time. Q. After you had dropped your anchor for the reason which you have stated, did you subsequently make a new maneuver? A. I did. Q. In what direction was that, inshore or outshore? A. Outshore. Q. Did the Restorer make a subsequent new maneuver? A. She did. Q. What do you know about that maneuver? A. After Capt. Pillsbury had left me, when he asked me to take up the new position, he went to the Restorer. The Restorer then got under way, shifting her berth to the northward and westward, but the exact bearing I do not know, because I was not on board of her. She got across my bow, and I was obliged to anchor to keep from going still further in. Then Capt. Pillsbury came out. Q. From where? A. Out towards me, either from the Manchuria or the Manning, and he passed me, and I asked him what the Restorer was trying to do, and he said he did not know, or something to that effect. He went to the Restorer, and the Restorer then took up a position practically in line with the position I wanted to take, and the one I suggested to Capt. Pillsbury, originally. Q. With the Restorer in the position that she was in, after crossing your bow in the first maneuver, what was necessary to put her in the position that she took in the second maneuver

which you have just testified to? A. Would have to go ahead on her engines with helm aport. Q. What engines? A. Both engines, if she had sufficient for turning. If not, she could go ahead on one engine and back on the other. She certainly could turn that way; go ahead with the port engine and turn with the starboard. Q. Did you see she made any difficulty in making the second maneuver? A. No. Q. Did you make any difficulty in making the second maneuver? A. None to speak of. I got a little further on her starboard quarter than I liked, and then shifted a little more to port. Q. Which was the more difficult maneuver made by you, the first or second? A. The second. Q. Which was the more difficult maneuver made by the Restorer, the first or second? A. I should say the second. Q. In making the first maneuver, would you find any advantage in having twin screws? A. A decided advantage. Q. Do you know of any reason why the Restorer did not properly make the first maneuver? A. No; I do not. Q. Was there any peril to the Restorer during the first maneuver? A. I do not know how close in she got. I do not know whether she took any soundings. Q. If there had been peril presumed or anticipated, was there any means of avoiding any in your judgment? A. She could have gone ahead on her port engines and backed on her starboard: but, if she could not do that, she could have anchored. Q. Either of the courses, in your opinion, would have kept her from the reef? A. Yes. Q. Do you know whether the Manning had any trouble in making the maneuver? A. Did not see any at all. Q. In your judgment, was the attempted maneuver, which we have designated the first maneuver, of the Restorer a proper one, or properly executed? A. It depends upon what they were trying to do. I don't know what they were trying to do. Q. If they were trying to go ashore, it was proper? A. It might have been successful. Q. Was it a proper maneuver to reach the position designated for the Restorer? A. I do not know what position was designated. Q. You do not know whether or not the position inshore and across your beam was her designated position or not? A. No; I do not. Q. Did you take your proper position in the first maneuver? A. No. Q. Was your present position inshore or outshore from where you did drop anchor? A. Outshore. Q. And the reason you took it was because of the line coming over your bow? A. Yes. Q. In order to execute your first maneuver with the assistance of the wind, the sea, your engines, and helm, was it made perilous because of your line running to the Manchuria? A. No; I was never in any peril. Q. If your maneuver was properly executed, would that line have been an element of danger? A. Not of danger. Q. If properly executed? A. Not of danger. It would have been an incumbrance in turning; that is all. Q. Was the Restorer's line an element of danger in the proper execution of her maneuver? A. I should not think so. Q. During your observation of the wrecking operations while at Waimanalo Bay, did you see at any time that the Restorer was in peril? A. As I said before, I do not know what soundings she got when she was inshore of me. She may have been; but I do not think so. Q. Prior to that? A. No. Q. Subsequent to that? A. No. Q. Did the Restorer have to depend entirely upon her engines to keep her from the reef in making that first maneuver? A. No; I should think she could have anchored without any difficulty. Q. Do you know of any reason why she could not have used her engines? A. Do not know any reason. Q. Will you state whether, in your opinion, she dropped her anchors at the proper time in making her first maneuver? A. She did not; that is to say, if the position that she subsequently occupied was the one intended for her."

The evidence showing, as it does, that the steamers Manning and Maui and the tug Fearless, with 3,647 combined horse power, together with the Manchuria's own engines and two of her anchors, were unable to pull that ship from the reef or to keep her from going further on, and that before the Restorer got any line to the Manchuria the ship was firmly embedded, it does not seem likely that the Restorer was capable of doing very much in the way of steadying the Manchuria, although no doubt she aided to some extent in that direction. The finding of the trial court, however, to the effect that the Restorer was

the chief agent in pulling the Manchuria's stern out 9½ degrees between August 25th and August 29th, we think clearly unjustified by the record. The court in its opinion said:

"The Manchuria's log reports that from 1 p. m. of August 21st to 12 midnight of August 24th, she headed S. S. E., and that thereafter her stern swung out from time to time until 1 a. m. August 29th, when she headed S. 13° E. On this day Metcalfe arrived and took charge of the salvage operations, and directed the Restorer to stop towing at 4:54 p. m. In this space of five days the direction the Manchuria was heading changed 9½ degrees toward the south and west, which was toward the shore, by which her position was changed to a marked degree for the better, inasmuch as her stern was swung out correspondingly toward the open sea, bringing her less broadside on to the reef than before. The broadside position is testified to by Metcalfe as being more dangerous and difficult than a head-on position. Here is a record showing a favorable change of the position of the Manchuria, which would naturally be produced by a pull on the stern from a position at or about right angle to the line of the hull. Such a force was exerted during those five days by the Restorer, and by the Manning after 2 p. m. of August 26th, and by cables of the Manchuria attached to anchors. On the first day of this period, August 25th, in the afternoon, a 7-ton anchor was laid with hawser to the starboard stern. On the third day another 7-ton anchor was laid with hawser to the starboard stern, and all this period there were two 2½-ton anchors with hawsers to port stern and two from port bow. Some credit must be given to these stern hawsers, if they were hove taut from time to time as the Manchuria swung around. The log notes only one such action; but Capt. Saunders in his deposition, on pages 8 and 9, testified that 'we hove our big anchors taut to keep the vessel as near steady as possible.' This clearly refers to the 7-ton anchors mentioned above. It is in evidence that at 10:45 p. m. August 24th the Restorer was directed to increase the speed of her engines, and this was continued; also that on the next day the Restorer was making a greater speed with her engines than usual. This increased strain was kept up during these five days; her log showing from 30 to 45 revolutions of her propeller. This evidence closely covers the time, as shown by the Manchuria's log, when she began to change her position for the better, about midnight of August 24th, which movement continued until the morning of August 29th, making a change in her direction for the better of 9½ degrees as shown above. From August 29th to and including September 2d, a period of four days, she swung around 2 degrees more, supposedly by the force of the steam winches alone, and the Restorer towing at only 20 revolutions. Then from September 2d to September 13th there was no further movement. The fact that in the five days from August 24th to August 29th the Manchuria swung, with the assistance of the Restorer, 9½ degrees, about 2 degrees a day, and in the next four days, without such assistance, she swung only 2 degrees, or one-half degree a day, is certainly favorable to the theory of the effectiveness of the Restorer in swinging the stern of the Manchuria to the sea. Although it is impossible under such circumstances to make an accurate estimate of the proportionate value of such efforts, it is the rule of admiralty courts to weigh such evidence liberally for the salvor."

The log of the Restorer shows that at 5:20 p. m. of August 24th the Manchuria signaled her to "reduce speed to 20 revs.," and that accordingly the Restorer's engines were then set at 20 revolutions. The next entry in her log, made at 8 p. m. of the same day, is as follows:

"Moderate E. N. E. breeze and sea. Sdgs aft 6½ fms. The C/S Restorer only to assistance, with two lines but slack. S/S Manchuria being held off reef by her port bower anchor with 15 fms. chain out. Two anchors led out from her port quarter attached to the 6x3 grapnel rope (part of originally given to U. S. S. Manning), and her 7-ton anchor attached to her steel wire hawser led out from her port quarter from her starboard side."

And at midnight of August 24th this entry was made:

"Moderate breeze and overcast, with increasing sea. Engines at 20 revs., as ordered, with slack hawsers."

Yet it appears from the log of the Manchuria that during that time the Manchuria's head changed 1½ degrees, which, as a matter of course, could not have been caused by the slack lines of the Restorer; it appearing by the testimony of her own captain that 20 revolutions of her engine were necessary to prevent her lines from chafing. It further appears from the log of the Restorer that at 7:33 a. m. of August 25th the Restorer obtained permission from the Manchuria "to put weight on hawsers" and to set her engines at 35 revolutions, and that two minutes thereafter the engines of the Restorer were accordingly set at 35 revolutions and so remained, according to the log, at 35 revolutions until 7:22 p. m. of August 26th, when the revolutions were reduced to 30. At 10:57 a. m. of August 27th her engines were stopped, at 11:18 a. m. of the same day they were set going at 30 revolutions, at 4:10 p. m. of August 28th they were increased to 35 revolutions, at 5:02 p. m. of the same day (August 28th) they were reduced to 30 revolutions, and at 1:45 p. m. of August 29th they were, according to the log, increased to 45 revolutions. During these various changes on the part of the Restorer, the Manchuria's head, according to her log, shows three changes, besides the change of 1½ degrees already referred to, to wit, at 1 p. m. of August 26th there was a change of 1 degree in her head, and between midnight of August 26th and 1 a. m. of August 27th a change of 5 degrees, and at 1 a. m. of August 29th her head changed 2 degrees. It thus appears that the greatest change in the Manchuria's head, to wit, 5 degrees, occurred at a time when the Restorer's engines had been running at 30 revolutions for between 5 and 6 hours, and that there was no change during the 29 hours that her engines remained at 35 revolutions, and, further, that the change of 2 degrees in the head of the Manchuria which occurred between midnight of August 30th and 1 a. m. of August 31st occurred at a time when the Restorer's engines were making but 20 revolutions —just enough, according to her captain's own testimony, to keep her lines from chafing. These facts, shown by the logs of the Manchuria and Restorer, respectively, would seem to indicate quite conclusively that the Restorer was certainly not the chief cause in the changes in the head of the Manchuria, aggregating 9½ degrees, although she probably was instrumental to some extent in those changes.

But, assuming that the conclusion of the court below to the effect that the swinging of the Manchuria was chiefly due to the action of the Restorer was correct, and conceding that the latter also rendered valuable services in the steadying and pulling of the Manchuria, still is the Restorer entitled to any bonus in view of the facts and circumstances of the case? As said by the proctors for the claimant, a vessel could hardly have been more favorably situated to render a genuine salvage service than was the Restorer, for "she was fully equipped and manned, yet disengaged, and neither seeking nor desiring the employment that, commercially, would have been advantageous to other ships." Yet there was not even a tardy offer on her part to go

to the assistance of the distressed ship, pounding heavily on the reef. Upon written request for her services only did she, in the afternoon of the second day, consent to render any assistance. The libelant's representatives at Honolulu would not even consent to get up steam, in order to be ready to start upon hearing from its head office in New York, without a guaranty on the part of the claimant for reimbursement for such expense. Such precaution and exaction may be commendable in securing the actual and true value of services rendered; but they come with no grace at all before a court of admiralty in behalf of a demand for a bonus. But this is not all. The libelant's head office in New York having, on the 21st day of August, 1906, granted the request for the Restorer's assistance to the Manchuria, that office on the same day cabled its Honolulu representatives to—

"keep a careful record of what you do in way of salving Manchuria, also particulars of her position, state of weather, sea, and tides, risks and perils of Restorer, description of other vessels engaged in work, and anything of value in determining salvage."

On the 24th of August Gaines, the libelant's superintendent at Honolulu, cabled its New York office, among other things, as follows:

"Manchuria is now so anchored as to keep her from pounding. * * * Restorer is only vessel with her to-day; has five lines out, and is keeping her from drifting further on reef. * * * Wrecking appliances will reach here from San Francisco Tuesday. Present plan is keep her loaded, so cannot move and pound on reef, until proper appliances arrive, when effort be made move her. * * *"

The next day, August 25th, Mr. Gaines cabled the libelant at New York the following report of Capt. Combe of the Restorer, of date August 23d:

"Now anchored with four hawsers to Manchuria. Am requested not to tow for present, but hold hawsers. They have filled all ballast tanks to keep ship in present position till more anchors run out and Lloyd's surveyor arrives from San Francisco with heavy gear before discharging cargo. She has ground bed into soft coral reef and sand on even keel. Weather fine; moderate sea. Only Restorer to assistance with hawsers."

On the same day, to wit, August 25th, the New York office of the libelant cabled its representative at Honolulu, among other things, as follows:

"Is there slightest chance of Restorer pulling Manchuria off before wrecking gear arrives? Do you think Manchuria purposely delaying to save salvage? If you think you can get her off without waiting for surveyor's arrival, can you not insist that you be allowed do so?"

In the Restorer's log we find this entry made at 7:50 p. m. of August 25th:

"Captain Combe boarded the S. S. Manchuria and again requested the captain to do something in the way of trying to pump out the ballast tanks or get schooners down to discharge cargo into, so as to give us a chance to get her off, but received the same reply as before when boarding her at 7:35 a. m. on the 23d; that being that they were unable to pump out their ballast tanks owing to the connections being broken, and that they could not lighten her till Lloyd's surveyor arrived with more wrecking gear, their orders being to hold the ship in her present position and keep her from drifting further inshore. I advised them again I was perfectly confident I could hold them off, and, what was more, could pull them off if they lightened the ship and gave me a chance,.

and also advised them they could not expect the C. S. Restorer to remain here for an indefinite time, because if anything happened to our cables we should be called off at once. Whilst aboard it was noticed she had a list to port, probably due to shifting of the cargo, which was then being carried on. The S. S. Manchuria was then heading S. 13 degrees E."

On August 27th Mr. Gaines cabled the libelant's office in New York this further report of Capt. Combe:

"Am perfectly confident could pull Manchuria off, if assisted by them discharging cargo, coal, water, ballast, which they will not do, saying cannot pump out water, connections broken. Firmly believe connections could be made aboard, or, if required, pumps obtained locally. Also saying they have been ordered not to discharge cargo till surveyor arrives; reason being to hold ship from drifting further inshore. This seems absurd, because Restorer can hold her off. They are now shifting cargo aft. Everything points to them not wanting us pull them off."

Not only do these communications and proceedings disclose upon the part of the libelant a very keen desire to obtain a large salvage award, but a distinct threat upon the part of the master of the Restorer, under direct suggestion from the libelant, to withdraw his vessel unless he was given a chance to get the Manchuria off before other aid could arrive, in disregard of the orders of the Manchuria's owners, of which the Restorer's master was aware, and which "chance" involved the lightening of the Manchuria, with the inevitable result of further embarrassing her should the Restorer fail; and this, too, when according to Capt. Combe's own testimony he had had no experience whatever in the matter of salving distressed vessels, and at a time when there was no immediate emergency so far as the Manchuria was concerned, since she had not only made a bed for herself, in which she was constantly becoming more secure, and at a time when there was not only no bad weather prevailing, but none to be anticipated, and when capable expert assistance was known to be on the way, soon to arrive. Upon these points we extract from Capt. Combe's testimony:

"Q. Had you, when you made this suggestion to Capt. Saunders (the master of the Manchuria), considered what it meant to have lightened a ship of that size, discharging her of her water, her coal, and her cargo?  A. I knew what it meant, and I was prepared to do my best if they gave me a chance.  Q. You were prepared to run the risk?  A. If they allowed me.  Q. What was the risk you were prepared to run?  A. The risk of lightening the vessel.  Q. What was that risk to the Manchuria in lightening?  A. If I was unable to pull her off, she would have gone further up.  Q. What risk in lightening the Manchuria do you refer to?  A. That is the risk, sir.  Q. What risk? The Court: He stated it. If he couldn't pull her off, she would have gone further up.  Mr. McClanahan:  That is the risk you were willing to run with the Manchuria— she would go further on if you were unable to handle her with your boat?  A. Yes.  Q. You seriously and purposely suggested that risk to Capt. Saunders?  A. I did.  Q. And you have never had anything to do with salvage?  A. No; I took a good opinion from the pilot. He is a man of considerable experience.  Q. Why, Captain, were you willing to have the Manchuria run that risk?  A. I was anxious to get her off, sir.  Q. Why?  A. Why, for the good of everybody.  Q. Did you not know at that time that a salvage expert was then on his way to Honolulu with wrecking paraphernalia?  A. I do not know just what day I first heard that; but I knew it.  Q. You knew that?  A. I don't know whether on that date or not; but I think I did.  I am almost sure I did.  Q. Then why this unnecessary haste to make this new offer of services to have the ship lightened?  Did you want to get her off before the salvor could get her?  A. Yes.  I knew Capt. Metcalfe, certainly; but I wanted to do what I

could for the ship. Q. Did you want to try before the salvor could get her? A. Yes. Q. To get her off before Metcalfe arrived? A. Yes, sir. There was no spite idea, it was just to do my best. There was no ill feeling anywhere at all. Capt. Saunders was as anxious as I was. Q. You knew at that time Capt. Saunders' orders from his owners? A. Capt. Saunders told me then that he had to keep the ship there until Metcalfe arrived with the paraphernalia."

The record shows that, as a matter of fact, it was little, if any, short of absurd to talk, on August 23d, about the Restorer pulling the Manchuria from the reef. When Capt. Metcalfe arrived, that expert said that five ships the size of the Restorer could not have done so. In further pursuance of the manifestly studious plan to make a case for a large salvage award to the Restorer, was the cable from the libelant's New York office of date August 29th, in which the libelant's representative at Honolulu was instructed, among other things, as follows:

"Have our attorneys in Honolulu advise you day by day as to proper course to preserve all our salvage rights. Is there any specialist on salvage law in Honolulu? Our object should be to use the fact that, but for Restorer, the Manchuria would have been total loss. Acknowledgment and report August 29th."

The record shows that these instructions were acted upon, and that an attorney was secured in Honolulu; his presence on the Restorer being noted in its log at 6:45 p. m. of the same day, August 29th, which, it will be remembered, was the day of Capt. Metcalfe's arrival from San Francisco with the wrecking outfit, and the day on which he ordered the Restorer's engines stopped. Two days afterwards, to wit, August 31st, Gaines cabled from Honolulu to the libelant in New York, as follows:

"Attorney returned this evening from Restorer. Reports valuable services already rendered, and good salvage claims if ship floated. Before ship left I suggested to Combe he better obtain written request. He has letter from Hackfelds, who are agents, requesting him (Combe) to her aid as soon as possible, but nothing said about compensation, so salvage claim unimpaired. Metcalfe, the expert, questioned to-day as to arrangements for compensation; but Combe instructed to refer all compensation questions to home office. Metcalfe will say to-morrow what further service required; but attorney advises Restorer stand by anyway till Manchuria floated. Probable this will interfere with proposed Midway trip, in which case thinks you better forward Combe instructions. There is temporary telephone connection with shore near the wreck, but is controlled by agents, who have a man always within hearing. Only other means communication is by land, which costs $25, whether merely messenger goes or passengers taken. I will go over again if anything important."

At this time, to wit, August 31st, Mr. Ward, vice president of the libelant, was at Guam, and the Restorer had been expected to meet him at a place called Midway. On August 31st, the libelant cabled from New York to Mr. Ward as follows:

"Lloyd's surveyor arrived Manchuria. Ordered Restorer stop engines. Intends put down anchors, then lighten ship, and pull her off by strain on winches. Combe reports, if is to go to Midway, must leave Manchuria not later than September 4th. We believe Lloyd's do not want Restorer to pull Manchuria off. Combe thinks could pull her off if she was lightened. Salvage attorney advises Restorer stand by until Manchuria floated. How does this affect your orders to have Restorer meet you off Midway?"

The next day, to wit, September 1st, Mr. Ward cabled from Guam, among other things, as follows:

"Inform Combe he must not leave Manchuria so long as he can be of least assistance, even if he is unable to meet me at Midway. Nothing must be done that would invalidate our claims for any salvage. Take advice of our attorneys."

The New York office of the libelant having been informed that the Restorer's compensation would be adjusted in New York, that office cabled its representative at Honolulu on September 6th, among other things, as follows:

"As underwriters propose settle salvage New York, it will be necessary all evidence and data be forwarded to enable us determine amount salvage. Please, therefore, send any data you have; also ask Combe send copy all records he was requested keep. Papers should, if possible, show whether or not Manchuria would been lost had not Restorer arrived so quickly. Also approximate value Manchuria and cargo separately."

It thus appears that Capt. Combe was specially requested to keep certain records in regard to the matter. And we find in the log of the Restorer certain entries which were manifestly made with a view of furthering the claim of that ship to a salvage award. For example, at 0:45 p. m. of the first day of her service, to wit, August 22d, is this entry:

"Signals received from S/S Manchuria to keep hawsers taut. Set engines at 20 revolutions. U. S. S. Manning still laying at anchor with both 8″ manila and 6x3 grapnel rope slack and engine stopped. By keeping our hawsers taut it saves the S/S Manchuria from being set further inshore by the wind and sea, which are on her broadside driving her on a lee shore."

And, after the night of August 22d, during the whole of which, with the exception of 2 hours and 10 minutes, when her engines were set at 20 revolutions (just enough, according to her master's testimony, to keep her lines from chafing), they were at 15 revolutions, there is this entry in the Restorer's log, made at 8:54 a. m. of August 23d:

"The captain of the S/S Manchuria reported ship resting quietly all night, probably due to strain put on Restorer's hawsers."

The facts shown by the record did not justify the cable of September 6th, above set out, in which the New York office stated in effect that the underwriters had proposed to settle "salvage" in New York. The record shows this in respect to that matter: On Metcalfe's arrival on the afternoon of August 29th, he dispensed with the services of the Restorer. That fact was thus reported by Gaines from Honolulu the next day, August 30th, to the New York office:

"Visited scene of wreck with Ballou, senior member our attorneys. Went on board Restorer. Ballou thought he better stop on board until to-morrow in case any question should arise. All rights to salvage preserved. Manchuria has been waiting arrival of Metcalfe, salving expert from San Fran. Metcalfe arrived 4 p. m. Ordered Restorer stop engines. Proposes to sink Manchuria to hold her until heavy anchors in position, then lighten and put strain on winches. Do not know what use he will require of Restorer, but she will stand by and render all assistance."

In Gaines' cable of the next day, August 31st, which has already been set out, it will be seen that he therein stated that:

"Metcalfe, the expert, questioned to-day as to arrangements for compensation ; but Combe instructed to refer all compensation questions to home office. Metcalfe will say to-morrow what further service required ; but attorney advises Restorer stand by anyway till Manchuria floated."

So that compensation, not salvage, was the matter spoken of between the parties to be referred for settlement in New York; and that fact is further shown by Metcalfe's cable of August 30th to the claimant's agent in San Francisco, in which he asked "What arrangement has been made services Restorer?" and by the San Francisco agent's telegram to Harriman in New York, and Harriman's reply thereto of date August 31st, as follows:

"Telegram received. Have made no arrangements regarding charges of Commercial Cable boat Restorer. Go ahead and use her, and I will attend to matter of charges afterwards. The Cable Co. is under obligations to us."

And by the San Francisco agent's reply to Metcalfe of the same date, to wit, August 31st, reading as follows:

"Restorer charges will be adjusted New York. Use as necessary."

The record shows that in view of these telegrams Metcalfe retained the Restorer, which fact was communicated to the libelant's New York office by its Honolulu representative, Mr. Gaines, on the 3d day of September, in these words:

"Have had an interview with Metcalfe, who had received cable his company saying compensation Restorer would be adjusted New York. Metcalfe said this was satisfactory, and Restorer would be kept by Manchuria."

In view of these facts it cannot be doubted that Metcalfe's understanding was that the compensation for the employed services of the Restorer would be adjusted by the respective parties in New York, and such is his testimony, from which we extract as follows:

"Q. Did you, Captain, know of the relation existing between the Cable people and Mr. Harriman? A. Before leaving San Francisco, it was conveyed to me in some way which I don't remember. It was conveyed to me that the business interests of both Harriman and the Pacific Cable Co. were pretty close. In what way I got the idea I can't tell you; but it was with me all the time I was down here when we had the Restorer in operation until we got back from Midway, and then I was very disagreeably disabused of the idea. Q. When you got this cablegram of the 31st of August (reading): 'Metcalfe: Restorer charges will be adjusted New York. Use as necessary'—and so forth, what did you understand that to mean? A. I understood by that that the parties interested, Mr. Harriman and the Cable Company, Mr. Harriman being president of the Pacific Mail Steamship Company, and I didn't know whether Mackay was the president of the Commercial Pacific Cable Company or not: I thought they had got their heads together and fixed on a figure to be paid, per diem or otherwise, as the case might be. Q. What did you know Mr. Harriman's connection to be with the Pacific Mail Steamship Company at that time? A. He was president of the company. Q. Did you know that? A. Oh, yes. Q. Why did you send a cablegram asking about the compensation to be paid the Restorer? A. Because it was my duty, as soon as I found out that no rate had been fixed for her employment, it was my duty, as representative of the parties interested, the owners and underwriters, to find out and establish the fact. Q. And the cablegram of the 31st of August in answer to yours of the 30th was satisfactory to you, was it? A. Perfectly, and I so expressed myself to several people; Capt. Pillsbury for one, because he was much interested with me, and several others, I haven't the least doubt—the agents, for instance. Q. Captain, in your capacity as representative of the underwriters, or as representative of the owners, did you ever propose to any one yourself

to settle a salvage claim for the Restorer in New York? A. No, sir. Q. Or any other kind of a claim? A. No, sir. Q. Or did you propose to any one down here in any capacity to settle the compensation for the services of the Restorer in New York? A. No; but if it had been intimated to me that they had been unable to come to any reasonable terms, I would have settled it very quickly. I had full authority. Q. Do you know Mr. Schwerin? A. Very well. Q. Do you know now the basis of this telegram from Mr. Schwerin of the 31st of August? A. Do you mean the telegram from Mr. Harriman to Mr. Schwerin? Q. Yes. A. I have heard it read in this court. Q. You think that telegram warranted Mr. Schwerin in sending his to you? A. Well, Schwerin is a pretty smart fellow. If Mr. Schwerin had sent me that same telegram, I would have known exactly what to do. Q. What would you have done? A. I would have approached the owners of the Restorer either here, probably through this office here, and requested them to name a price per day for that vessel, including the time she had already been out there, either on the basis of such much per day and pay their expenses or combining the two. If the rate had been satisfactory, I would have said, 'All right, I will give you an agreement to that effect,' and that would have been binding. If they had asked me a different figure, that I thought outside of all reason, I would have said, 'I will give you so much per day and pay your expenses,' and if they declined I would have said, 'All right, gentlemen, pick up your anchor and go back to town.' Q. That is, if you had received the cablegram that Mr. Schwerin did? A. Yes. Q. Captain, during the salvage operations, and after the receipt of the cablegram of August 31st, did you in any manner restrict or intend to restrict the services of the Restorer? A. Not in the very least. Q. Did you limit or intend to minimize the services to be performed by the Restorer? A. Never had the slightest idea of such a thing. Q. In reference to the positions given to the three ships, what position did you give to the Restorer? A. Well, I should say the Restorer had about the best position of the three. Q. Why didn't you make arrangements to have the Manning tow the Manchuria to Honolulu? A. Well, she is a government ship to begin with. My impression was all along, from the time I received that cable, that the Restorer was under pay and at my service absolutely, and when I am paying for anything I make the best use of it. Q. You knew that the government's ship services were free, did you? A. Quite free; yes, sir. Q. Is that the reason you gave the tow to the Restorer? A. I gave it to her because I thought she was in my employ, and another thing she is the more powerful ship of the three. Q. In your opinion, could the Manning have performed the tow? A. Oh, yes: not quite as quickly as the Restorer, but it could have towed the Manchuria in the weather that prevailed at that time. Q. Could the Iroquois have done it? A. Yes; in my opinion, she could. We handle those ships with a great deal smaller tugs than the Iroquois."

The libelant's New York office was informed by the cable from its Honolulu agent of August 31st that:

"Metcalfe, the expert, questioned to-day as to arrangements for compensation; but Combe instructed to refer all compensation questions to home office. Metcalfe will say to-morrow what further service required."

And when, according to Metcalfe's understanding, it had been finally agreed between the parties in interest that compensation for the Restorer's services should be adjusted by them in New York, and he had continued her employment, which certainly excluded any idea of salvage remuneration for her future services, the libelant's New York office was notified by its Honolulu agent's cable of September 3d that:

"Metcalfe said this was satisfactory, and that Restorer would be kept by Manchuria."

If, notwithstanding all this, the libelant intended to claim a reward based on salvage principles, surely good faith required it to apprise Metcalfe of that fact. There was not only this bad faith on the part

of the libelant, but its action throughout was not only calculating and mercenary in the extreme, but was entirely lacking in those elements which often induce courts of admiralty to make awards at times greatly exceeding the expenses, losses, and actual value of the salvor's services. A salvor, said the court in the case of The Howard, 12 Fed. Cas. 630, 633—

"who, regardless of personal considerations, gallantly rushes into dangers to preserve the lives and property of others, when exposed to the horrors of shipwreck, or he who promptly goes forward, and contributes his aid when he believes his services will be beneficial in preventing impending loss, without stopping to inquire what amount in dollars and cents his exertions will bring to his own pocket, will always receive that liberal reward for his services which it is the policy of the law to allow, and which courts feel pleasure in awarding to generous and manly conduct; while he who holds back and quietly looks on at approaching ruin until his own services become indispensable to the preservation of the property he sees exposed, with the expectation that his reward will thereby be increased in proportion to the increased dangers from which the property is ultimately rescued, will find that he is disappointed in the realization of his golden hopes, and that a display of avarice at such a time renders him an object of contumely and reproach."

In line with these remarks and our conclusions, are the cases already cited, and The Bello Corrunes, 6 Wheat. 153, 5 L. Ed. 229; The Boston, 3 Fed. Cas. 932; The Byron, 4 Fed. Cas. 956; The D. M. Hall, 7 Fed. Cas. 770; Hand v. The Elvira, 11 Fed. Cas. 413; The Mount Washington, 17 Fed. Cas. 925; Spreckels v. The State of California (D. C.) 45 Fed. 649; The Clandeboye, 70 Fed. 631, 17 C. C. A. 300; The Ragnarok (D. C.) 158 Fed. 694.

The cause is remanded to the court below, with directions to strike from the judgment the bonus allowances, aggregating $30,000, and the interest allowed thereon by said judgment and, as so modified, the judgment will stand affirmed; Pacific Mail Steamship Company to recover its costs on this appeal.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes